**Harry T. SAPP, Jr., also known as Tom Sapp, individually, Plaintiff–Appellant,**

v.

**MORTON BUILDINGS, INCORPORATED, Defendant–Appellee.**

No. 91–2078.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1992.

Decided Aug. 24, 1992.

---

Lex Venditti, William S. Spangler, Sr. (argued), Steven A. Johnson, Spangler, Johnson & Associates, Merrillville, Ind., for plaintiff-appellant.

Gregory S. Bell, Sutkowski & Washkuhn, Peoria, Ill., Terrence L. Smith (argued), Smith & Debonis, East Chicago, Ind., for defendant-appellee.

Before WOOD, Jr.,* COFFEY, Circuit Judges and CURRAN,** District Judge.

COFFEY, Circuit Judge.

Harry T. Sapp, Jr. ("Sapp") filed this diversity action against Morton Buildings, Inc. ("Morton") seeking damages for the death of a quarter horse, "MBJ Tuff to Beat". Sapp alleged that Morton was liable for the horse's death under a strict liability theory pursuant to the Indiana Product Liability Act, Ind.Code § 33–1–1.5–1 *et seq.* (West 1991) ("Act") or, alternatively, under a theory of negligence. Because Sapp failed to make out a *prima facie* case under the Act, the district court submitted the case to the jury on the negligence theory only. The jury returned a verdict of no liability. Sapp appeals, arguing that the district court erred in refusing to allow the jury to consider the strict liability claim. We affirm.

## I.

In 1982, Sapp contracted with Morton to remodel a barn on Sapp's farm in Leroy, Indiana, and convert it into a stable. Several months later, Sapp contracted with Morton to add a building adjoining the remodeled barn. The connected buildings were intended to serve as a large stable. Because the existing barn had non-standard dimensions, all materials, except the

doors and windows, had to be tailor-made at the building site to fit the existing structure. This tailor-making of the parts included pieces of channel iron nailed to cover the top of exposed boards in the stable to prevent the horses from chewing on the wood. Morton manufactured the channel iron used on this job. The new adjoining stable building was of standard design and therefore was largely prefabricated at one of Morton's plants.

The horse "MBJ Tuff to Beat" was kept by Sapp in the No. 2 stall of the barn remodeled into a stable. In April, 1985, the horse suffered a laceration on its lip. Shortly after suffering the injury, the horse developed an infection, foundered and eventually had to be destroyed. Sapp contends that the laceration and the resulting infection were caused by an improperly installed and defective piece of channel iron. At trial, Morton argued that the horse received the laceration to its mouth as a result of an improperly maintained feed box constructed, designed and maintained by Sapp. Both sides agree that the law of Indiana is the substantive law governing this appeal, and that our review of the issue presented is *de novo*.

## II.

■ The appellant challenges the district court's ruling that his strict liability theory could not be submitted to the jury because he failed to make out a *prima facie* case under the Act. The Act provides, in pertinent part, that

> "... One who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to his property is subject to liability for physical harm caused by that product to the user or consumer or to his property if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition, and if:

* Judge Wood, Jr. assumed senior status on January 16, 1992, after oral argument in this case.

** The Honorable Thomas J. Curran, District Judge for the Eastern District of Wisconsin, is sitting by designation.

(1) the seller is engaged in the business of selling such a product; and (2) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which it is sold by the person sought to be held liable under this chapter." Ind.Code § 33–1–1.5–3(a). The Act defines a "product" as "any item or good that is personalty at the time it is conveyed by the seller to another party. It does not apply to a transaction that, by its nature, involves wholly or predominately the sale of a service rather than a product." Ind.Code § 33–1–1.5–2.

After listening to the evidence submitted by both parties, the district court ruled that the strict liability theory under the Act should not be submitted to the jury, and stated, "I am absolutely and firmly convinced that [the channel iron] is not a product." The Act in defining a "product" draws a crucial distinction between transactions which involve "wholly or predominately the sale of a service rather than a product." Although we have been unable to locate a case squarely on point,[1] we hold that Morton's remodeling of Sapp's barn was a transaction involving predominately the sale of service, rather than a product. Thus, the district court ruling was proper in finding that the Act was not applicable to Sapp's action.

In explaining our reasoning, we turn to the case law of Indiana wherein the Indiana courts have considered the products/services distinction drawn by the Act. In *Lilge v. Russell's Trailer Repair, Inc.*, 565 N.E.2d 1146 (Ind.App.1991), the defendant was hired to install a bumper and a rear cargo box on a truck. The plaintiff was a delivery driver who had been injured when he fell while stepping down to the bumper from the back ledge of the rear cargo box. The defendant argued that the Act was inapplicable because its work consisted mostly of the provision of services.

The court reversed the summary judgment entered in the defendant's favor after concluding that there remained a genuine issue of material fact as to whether the defendant had manufactured the bumper it installed. The answer to this question, the court reasoned, could "determine whether the transaction was predominately the sale of a service rather than a product." *Id.* at 1149. In *Ferguson v. Modern Farm Sys., Inc.*, 555 N.E.2d 1379 (Ind.App.1990), a worker who fell off a ladder attached to a grain bin sued the owner, the assembler and the furnisher of component parts of the bin for his injuries. In holding that the Act applied to the grain bin action, the *Ferguson* court briefly alluded to the Act's services/product distinction, noting that the Act "did not contemplate a distinction between movable and nonmovable property, but rather sought to exclude transactions which relate primarily to the act of providing a service, such as that provided by an accountant, attorney or physician." *Id.* at 1384–85. The *Lilge* court's application of the Act to the grain bin action makes clear, however, that licensed professionals are not the only ones who can be considered providers of services under the Act.

The facts of this case persuade us that Morton's work on behalf of Sapp lines up more properly on the service side of the product/services division. The stable in which "MBJ Tuff to Beat" was injured was not prefabricated at a Morton plant and erected on Sapp's farm, as was the large stable Morton built adjacent to the remodeled barn. Warren Koehl, the Morton salesman who worked on the Sapp project, testified at trial that the Morton employees "retrofitt[ed]" the barn in order to convert it into a stable. Koehl's testimony makes clear that the stalls constructed by Morton in the remodeled barn were not the standard Morton size, and that the materials used had to be modified "on the job" to custom fit the new stable. As Koehl stated, "[w]hen we go into a situation like this,

---

1. *Hamilton v. Roger Sherman Architects Group,* 565 N.E.2d 1136, 1137 (Ind.App.1991) concerned a factual situation closely analogous to the one we confront in the instant case. In *Hamilton,* the plaintiff filed an action under the Act against an architect who designed a bar in a restaurant and the contractor who built it. Although the defendants argued that the bar was not a product under the Act, the Indiana appeals court did not reach the issue because it held on other grounds that the Act was not applicable.

this was not a Morton building, so we had to make everything fit on the inside." "Meaning, when you have a project like this, everything has to be basically field designed. It can't be designed at the office or whatever. We sent out the components, but the components have to be cut to fit on the job." Thus, in sharp contrast to the prefabricated building also provided by Morton, the remodeled barn required Morton to make numerous and extensive site-specific adjustments to convert the building into a stable. The Morton employees did not simply install a prefabricated product on Sapp's property, like the truck bumper in *Lilge* or the grain bin in *Ferguson;* they custom designed and fit their materials to the specifications of the old barn. For this reason, we conclude that, as to the building in which the horse was injured, the transaction was primarily a sale of a service in the form of the remodeling of the barn to convert it into a stable.

Our conclusion that Morton's work was predominately a provision of a service and not a product is fortified by the analysis in *Grain Dealers Mut. Ins. Co., Inc. v. Chief Indus., Inc.,* 612 F.Supp. 1179 (N.D.Ind. 1985). In *Grain Dealers,* the plaintiff alleged that the defendant had negligently[2] designed, manufactured, and assembled a large capacity, all-steel grain storage bin. The defendant responded that the complaint was time barred by the Indiana Product Liability Act's statute of limitations, Ind.Code § 33–1–1.5–5, which required that product liability actions "be commenced within two [2] years after the cause of action accrues or within ten [10] years after the delivery of the product to the initial user or consumer." *Grain Dealers,* 612 F.Supp. at 1180. The plaintiff countered that the applicable statute of limitations was Ind.Code § 34–4–20–2, which provided that any action for damages to real and personal property arising out of the design, planning, supervision, construction or observation of an improvement to real property must be brought within ten (10) years of the date of substantial completion of the improvement. *Id.*

The *Grain Dealers* court ruled that the product liability statute of limitations applied to the design, manufacturing, and assembling of the grain storage bin. The real estate improvement statute, the court reasoned, had "never been applied to actions against entities like [the defendant] who design fungible products without any particular parcel of real estate in mind and do not participate in the on-site construction of an improvement to real estate." *Id.* at 1181. Conversely, "the Indiana cases in which the real estate improvement statute has been applied have all involved actions against an entity which was intimately involved in designing, planning, constructing, or supervising the construction of an improvement to a particular piece of real estate." *Id.*

The remodeling Morton performed on Sapp's barn more closely resembles the service-like activities the *Grain Dealers* court identified as falling under the real estate improvement statute. Morton can accurately be described as having been intimately involved in the designing, planning, constructing and supervising of an improvement to a particular piece of real estate—the remodeling of the Sapp barn into a stable. Thus, Morton's work on the stable in which Sapp's horse was injured falls under the statutory scheme concerning real estate improvements and not the Act.

■ Contrary to this analysis, Sapp argues that language in the *Grain Dealers* opinion suggests that the channel iron in the instant case should be considered a product under the Act. As Sapp points out, the *Grain Dealers* court observed that "courts in Indiana treat an action against a manufacturer of a product as products liability actions even if the product ultimately becomes a part of an improvement to real estate." *Id.* at 1182; *see also Ferguson,* 555 N.E.2d at 1385 ("Other cases which have applied the Indiana Product Liability Statute demonstrate that an action against a party for a defective item which becomes part of an improvement to real estate after the item is delivered by the manufacturer,

---

**2.** The Act was amended in 1983 to exclude from its coverage negligence actions. *See* Ind.P.L. 277–1983, Sec. 1.

is a product liability action"). As we noted above, Morton did manufacture the channel iron it used in remodeling the stable. However, we do not read either *Grain Dealers* or *Ferguson* to mean that all materials used in any improvement of a parcel of real estate should be considered products under the Act. Instead, we understand the cases to stand for the sensible proposition that *if an item is a product,* its use in the improvement of a parcel of real estate does not take it out of the Act's coverage. The crucial assumption, of course, is that an item is already a product before it has been made part of an improvement to real estate. As we have already noted, Morton's remodeling of the Sapp barn was primarily a sale of a service (remodeling), not a product, and that Act explicitly excludes such transactions from its coverage.

The cases cited by the *Grain Dealers* and *Ferguson* courts in support of their assertion that the Act's coverage extends to products made part of an improvement to real estate demonstrate that the situations in which courts have applied the Act are sharply different than the one presented here. The cases are: *Ruther v. Robins Eng'g & Constructors, Div. of Litton Sys., Inc.,* 802 F.2d 276 (7th Cir.1986) (truck hopper basement and system were products under the Act); *Corbin v. Coleco Industries, Inc.,* 748 F.2d 411 (7th Cir.1984) (Act applied to manufacturer of above-ground swimming pool); *Wilson v. Robertshaw Controls Co.,* 600 F.Supp. 671 (N.D.Ind. 1985) (Act applied to action against water heater control manufacturer); *Coffman v. Austgen's Elec., Inc.,* 437 N.E.2d 1003 (Ind. App.1982) (in strict liability action against manufacturer of an auger and grain dryer, claim would have been governed by the Act had it been in effect at the time of plaintiff's injury); *Shanks v. A.F.E. Indus., Inc.,* 275 Ind. 241, 416 N.E.2d 833 (1981) (common law predecessor to Act was applied in strict liability action against manufacturer of a grain dryer); *Lukowski v. Vecta Educ. Corp.,* 401 N.E.2d 781 (Ind. App.1980) (strict liability in tort recognized against manufacturer and installer of gymnasium bleacher); and *Neofes v. Robertshaw Controls Co.,* 409 F.Supp. 1376 (S.D.Ind.1976) (strict liability action against

manufacturer of component part of water heater, as well as against the heater's manufacturer, was cognizable under Indiana law). *See also Lantis v. Astec Indus., Inc.,* 648 F.2d 1118 (7th Cir.1981) (the common law predecessor to the Act was applied to the manufacturer of a stationary asphalt mixing plant which was assembled at the manufacturer's plant, disassembled, and then erected on the customer's property).

As these cases demonstrate, the Act has been applied to goods manufactured without any particular parcel of real estate in mind and which are then made part of an improvement to real estate. The Act has also been applied to manufacturers of fungible products who sometimes install or assemble their products on site. However, Sapp has cited no case nor have we found one in which the Act has been applied to materials used in the remodeling and conversion of a building to a different use, or to a defendant like Morton who was intimately involved in the design, planning, and construction of an improvement to real estate which largely consisted of custom-fitting materials for the dimensions of a non-standard building. Based on these precedents, the district court's ruling was proper in finding that the channel iron used in the remodeling of Sapp's barn was not a product within the meaning of the Act.

## III.

Even assuming, *arguendo,* that the district court had submitted the strict liability theory to the jury, the jury's verdict indicates that Morton still would not have been found liable. In his opening statement to the jury, Morton's counsel admitted that the channel iron in the stall in which "MBJ Tuff to Beat" was housed had been improperly installed by the Morton employees who remodeled the barn. However, Morton's counsel insisted that the channel iron did not cause the laceration which ultimately led to the horse's death. Instead, Morton's trial theory was that a feed box with a jagged hole in the stall was the cause of the horse's fatal injury. Morton presented expert testimony in support of this theory. Dr. Gordon James Baker, a professor and chief of equine medicine and

surgery at the University of Illinois College of Veterinary Medicine, testified that on April 29, 1985, he traveled to Leroy, Indiana to examine the injured "MBJ Tuff To Beat." Dr. Baker was hired by Sapp's insurance company to determine whether there were grounds for humane destruction of the horse. Dr. Baker was accompanied to the Sapp ranch by Dr. Tom Goetz, an associate professor at the University of Illinois College of Veterinary Medicine and an expert in equine internal medicine. Upon arriving at the Sapp ranch, the two were escorted to the stall in which the horse was injured. Dr. Baker's examination of the horse's laceration led him to conclude that the wound occurred when the horse caught his "muzzle in something and pull[ed] away." After examining the horse's stall, Dr. Baker concluded that "the horse cut his mouth in the feed [box] because there was a jagged hole in the feed [box]. To me, it looked like exactly the sort of hole where the horse would have put his muzzle in and pulled back." Dr. Baker testified that it was unlikely that the horse could have been cut on the channel iron because the width, shape and size of the horse's head would have made it virtually impossible for him to have caught his lip on the channel iron. In his testimony, Dr. Goetz concurred with Dr. Baker's opinion of the source of the horse's injury. In his closing argument, Morton's counsel emphasized that the feed box and not the channel iron caused the horse's laceration, and reminded the jury of the testimony of Dr. Baker and Dr. Goetz.

The jury was given a Special Verdict form with eight questions when it retired for its deliberations. The first question read "Was the defendant, Morton Buildings, Inc., at fault?" The jury answered this question "No" and, as instructed by the form itself, was therefore not required to answer any more of the Special Verdict questions.[3] As Morton maintained at oral argument on appeal, the jury's finding of no liability was an indication that it accepted Morton's theory of the case, i.e., that

the channel iron was not the cause of the horse's death. As we stated above, Morton *admitted* at trial that it had improperly installed the channel iron in the horse's stall. Therefore, had the jury believed that the horse's death was caused by a laceration it received from the channel iron, it would necessarily have answered that Morton was at fault and thus liable. A finding of no liability represented the jury's determination that the channel iron did not cause the horse's death. Thus, even if we had concluded that the channel iron was a product within the meaning of the Act, the district court's failure to submit the strict liability theory to the jury would have been harmless in light of the jury's determination that the channel iron did not cause the horse's injury.

### IV.

The jury's verdict absolving Morton of liability is

AFFIRMED.

---

**3.** The remainder of the Special Verdict questions asked whether the defendant's fault was a proximate cause of the plaintiff's property damage, whether the plaintiff was at fault and, if so, the extent of his contributory negligence, and the total amount of property damage suffered by the plaintiff.