**Naomi WHITAKER, Plaintiff,**

**v.**

**T.J. SNOW CO., INC., et al., Defendants.**

**No. 3:95–CV–752RP.**

United States District Court,
N.D. Indiana,
South Bend Division.

Feb. 10, 1997.

Dale J. Starkes of Starkes Law Offices in Winamac, IN, and Edward L. Murphy, Jr., of Miller, Carson, Boxberger and Murphy, Fort Wayne, IN, for Plaintiff.

John E. Doran of Doran, Blackmond, Ready, Hamilton and Williams, South Bend, IN, for T.J. Snow Company, Inc.

## MEMORANDUM AND ORDER

PIERCE, United States Magistrate Judge.

Plaintiff Naomi Whitaker was employed by Walker Manufacturing Company ("Walker"). On September 18, 1993, she was injured while operating a seam welder which had been manufactured and sold to Walker by defendant RWC, Inc. ("RWC") and later serviced by defendant T.J. Snow Company, Inc. ("Snow"). Whitaker commenced the present action on September 14, 1995, asserting strict liability and implied warranty claims arising out of the remanufacture and sale of the welder to her employer. On July 2, 1996, the court granted a motion for summary judgment by RWC. This case is now before the

court on a motion for summary judgment by Snow. For the reasons which follow, Snow's motion will be granted.

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for the motion, and identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Rule 56 imposes no requirement on the moving party to "support its motion with affidavits or other similar materials negating the opponent's claim." *Id.* at 323, 106 S.Ct. at 2553; *John Hancock Mut. Life Ins. Co. v. Weisman*, 27 F.3d 500, 503 (10th Cir.1994); *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n. 3 (7th Cir.1994).

Once a properly supported motion for summary judgment is made, the party that bears the burden of proof on a particular issue at trial cannot resist the motion by merely resting on its pleadings. *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir.1994). Rather, as Fed.R.Civ.P. 56(e) makes clear, "[T]he adverse party's response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552; *Jean v. Dugan*, 20

F.3d 255, 260 (7th Cir.1994). The nonmoving party must do more than demonstrate "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted); *Griffin v. Air Line Pilots Ass'n, Int'l*, 32 F.3d 1079, 1084 (7th Cir.1994); *Bostic v. City of Chicago*, 981 F.2d 965, 969 (7th Cir.1992).

In determining whether there is a genuine issue of material fact, the court must construe all facts in the light most favorable to the party opposing the motion and draw all inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir.1992). Not every factual dispute creates a barrier to summary judgment. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Derrico v. Bungee Int'l Mfg. Co.*, 989 F.2d 247, 250 (7th Cir.1993). Moreover, "[a] genuine issue for trial only exists where there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511; *Unterreiner v. Volkswagen of America*, 8 F.3d 1206, 1210 (7th Cir.1993). The inquiry involved in ruling on the motion for summary judgment implicates the substantive evidentiary standard of proof that would apply at trial. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Jean*, 20 F.3d at 263.

### Facts

In 1978, RWC received an order (RWC's order number 5725) from Walker for an item of machinery described as an A.C. Seam Welder. (Perlberg Aff. ¶¶ 4, 5 and attachment.) On February 16, 1979, RWC shipped the seam welder bearing serial number 5725

to Walker. (*Id.*) Snow had no input or involvement in the original design of the seam welder or in the additional devices added thereto which controlled the welder's mechanical activity. (Pepping Aff. at 2.)

Snow is in the business of servicing, selling, consulting, designing, and building welding equipment and supplies, robots, and automatic arc welders. (Pepping Aff. at 1; Pepping Dep. at 6.) Snow also repairs, reconditions, and refurbishes or remanufacturers existing equipment. (Pepping Dep. at 6–7.) In February or March of 1988, Walker contacted Snow and solicited a bid to upgrade the electrical circuits of two of Walker's catalytic converter seam welders. (Pepping Aff. at 1; Pepping Dep. at 39.) Walker specified all equipment to be installed on the seam welders, including a Gould three axis programming unit with separate servo motors on each axis. (Pepping Aff. at 1, 2 and Exh. A; Pepping Dep., Exh. 2.) Snow was to obtain the Gould units and add their cost to its bid to Walker for the work to be performed. (Pepping Aff. at 1.)

Snow prepared a shop order, dated April 15, 1988, for the retrofitting of the two catalytic converter seam welders, including the one in question which bore serial number 5725. (Pepping Aff., Exhs. B.) The shop order provided that Snow was to add a Gould unit with separate servo motors on each axis to the seam welder; install a new water circuit, air circuit, and a Weltronic WT–900 weld control; design and build a water catch basin/tray with outlet; and clean and paint the machine. (Pepping Aff., Exh. B; Pepping Dep., Exh. 2.) The shop order specifically provided that the seam welder was not to be rebuilt. (Pepping Aff. at 1 and Exh. C.)

Snow obtained the Gould units which Walker had requested and added their cost to the work performed for Walker. (*Id.*) Snow added component parts to replace parts on the welder which may have been damaged. (Pepping Dep. at 95), and performed design work in order to accommodate some of the component parts specified by Walker. (Pepping Dep. at 96; Pepping Aff. at 2.) In particular, Snow referred to the drawings supplied by Walker to make the

changes to the seam welder's electrical circuit which were required in order to accommodate the new Gould replacement unit. (Pepping Aff. at 2.) Snow had no input or involvement in the design of the component parts it added to the seam welder that controlled the welder's mechanical activity. (Pepping Aff. at 2.) Snow did not change the welder's mechanical function because there was only one way in which the welder could work. (Pepping Dep. at 48–49; Snow Dep. at 19–21.)

The work Snow performed on the welder amounted to "refurbishing." (Pepping Dep. at 11.) Refurbishing entails work which is less extensive than reconditioning, which in turn, entails work which is less extensive than remanufacturing. (Pepping Dep. at 10–11.) Normally, a refurbishing is "just an upgrade" of a product, (*id.* at 11), a very minimal amount of work is performed on equipment that is refurbished. (Pepping Dep. at 16.) In contrast, when a machine is remanufactured, its frame is completely torn down and all of the component parts are removed and inspected individually during reassembly. (Pepping Dep. at 17.)

After Snow installed the electrical circuit on the seam welder, Walker sent a representative, Jim Conier, to Snow's factory to program the new electrical system because Snow was not familiar with the system and had never installed, used, or worked with the Gould units on any prior occasion. (Pepping Aff. at 2; Pepping Dep. at 12–13.) Operation of the seam welders was demonstrated to Walker personnel at Snow's plant after the refurbishing was complete and before the seam welders were shipped to Walker. (Pepping Aff. At 3; Pepping Dep. at 42.)

On May 27, 1988, Snow shipped the seam welder to Walker. (Pepping Aff. at 2 and Exh. C.) Snow returned the welder to Walker in the same configuration as it was when received and, in T.J. Snow's opinion, in the same configuration as originally made by its manufacturer, RWC. (Snow Dep. at 19–21.) The seam welder's mechanical parts remained as they were originally designed. (*Id.*) Snow did not engineer the seam welder's electrical sequence for controlling the welder's mechanical motions and functions in

the automatic mode of operation; Weldmation, Inc., engineered the electrical sequence. (Pepping Aff. at 2.)

It was anticipated that the repair and refurbishing work performed by Snow would lengthen the useful life of the seam welders. (Snow Dep. at 60.) Part of the purpose of refurbishing a machine is to increase its useful life. (Pepping Dep. at 11.) However, the seam welder was not obsolete when received by Snow; it had useful life remaining. (Snow Dep. at 19–21; Pepping Dep. at 111.) The total cost of the work performed by Snow on the seam welder was $61,065.00, whereas a new seam welder would have cost approximately $100,000.00. (Snow Dep. at 11.)

In the course of repairing, reconditioning, refurbishing or remanufacturing existing equipment, Snow attempts to ensure that the equipment complies with all applicable safety regulations including OSHA, ANSI, and RWMA (Resistance Welder Manufacturers Association). (Pepping Dep. at 9, 22; Snow Dep. at 18.) To this end, when any machine is sent to Snow, Snow employees inspect the machine and contact the customer if there is any apparent violation of safety regulations in connection with the machine. (Pepping Dep. at 13, 22; Snow Dep. at 23, 28, 29, 34.) For example, machines are inspected to determine the location of potential pinch points and whether the safety regulations require guarding of those pinch points. (Snow Dep. at 30–31.) If an inspection results in a determination that guarding is necessary for any pinch points, Snow's normal practice is to inform the customer of the need for guarding. (Snow Dep. at 30–31.) Usually, Snow would first make an oral report of any such safety violation and follow-up in writing to the customer. (Pepping Dep. at 15; Snow Dep. at 31.)

Prior to March of 1988, Snow and Walker had an established business relationship. (Pepping Dep. at 18.) Walker had previously sent Snow approximately ten machines for reconditioning or remanufacture. (Pepping Dep. at 19.) While those machines were being reconditioned or remanufactured, representatives of Snow had conversations with representatives of Walker regarding the need for guards on the machines in order to comply with OSHA and other safety regulations. (Pepping Dep. at 21.) Whenever Snow informed Walker of any safety problems, Walker was receptive to Snow's safety advice. (Pepping Dep. at 27.)

As part of the work to be performed in refurbishing Walker's seam welders, Snow was to inspect and determine if guarding was needed and, if so, where. (Pepping Dep. at 26–27.) Snow should have either brought each seam welder into compliance with applicable safety regulations or informed Walker in the event a seam welder did not comply with the regulations. (Snow Dep. at 35.) The refurbishing of the seam welders was a rush job because of Walker's pressing needs. (Snow Dep. at 12.) That fact, however, did not alter the work which was to be performed. (Snow Dep. at 12.)

Although there is no written documentation, Snow believes that the standard inspection was performed on the seam welder in question. (Pepping Dep. at 33; Snow Dep. at 23.) There is no written documentation that Snow informed Walker of any violation of a safety regulation or of any pinch points which required guarding. (Pepping Dep. at 31–32.) Mark Pepping, the Snow employee who would have advised Walker orally if there were any safety violations, does not recall doing so. (Pepping Dep. at 27, 28, 31–32.)

There is no record that Snow provided Walker with any written instructions or operating manuals when it shipped the seam welder to Walker (Pepping Dep. at 46), and Snow did not provide Walker with any written warnings. (Pepping Dep. at 61.) Snow's normal practice was to put warning stickers on all welders disclosing potential pinch points, but because the job for Walker was a rush job, no such stickers, decals, or other warnings were placed on the seam welder in question. (Pepping Dep. at 61.)

The welder in question was not in compliance with OSHA regulations when Snow returned it to Walker. (Rennell Aff. ¶ 5.) Specifically, the seam welder was in violation of the OSHA regulation that requires all press welding machines to effectively guard

pinch points. (Rennell Aff. ¶6.) The only guarding on the pinch points on the seam welder was the two hand controls, which are inappropriate guarding under OSHA regulations. (*Id.*) Snow performed no work on the seam welder after May, 1988. (Pepping Aff. at 3.)

On September 18, 1993, Naomi Whitaker, a Walker employee, was operating the seam welder. She had been employed at Walker for approximately six days and had been operating a seam welder for five days when the accident occurred. (Whitaker Dep. at 6–7.)

The sequence of operation of the welder was to put the catalytic converter into the cradle and simultaneously push two palm buttons. The machine would not operate if only one palm button was pushed. (Whitaker Dep. at 47.) Once the buttons were pushed, the cradle top would come down on the catalytic converter, the cradle and axle would shift and go back into the wheels, and one side of the converter would be welded. Then the welder would stop, spin, and proceed to weld the lip on the opposite side of the converter. (*Id.* at 48–49.) When placing the converter into the cradle, Ms. Whitaker was not reaching in close proximity of the welding wheels. (*Id.* at 56–57.)

On the second day of Ms. Whitaker's employment, Tim Kaizer, another Walker employee, showed her how to operate the seam welder and how to examine the weld. (*Id.* at 27–28.) In the welding process, small molten metal particles were produced and some of them would get onto the welding wheels. Ms. Whitaker was instructed by other Walker employees to take a chisel and hit the metal weld beads off the wheel. (*Id.* at 33–34, 67–68.)

Ms. Whitaker's accident on September 18, 1993, did not occur while she was engaged in the welding process. (Whitaker Dep. at 68.) Observing a faulty weld, (*Id.* at 57), she picked up a chisel, took five or six steps around to the left side of the seam welder, which had an opening in the left side of approximately two to three feet, and then took a step or two to the rear of the welder in order to reach inside. (*Id.* at 59–62.) While Ms. Whitaker was reaching into the welder to knock weld beads off the wheel, her hand was caught, breaking her left index and middle fingers. (*Id.* at 64, 68; Amended Compl. ¶6, 8; Pepping Aff., Exh. D.) The seam welder did not perform any differently than it had prior to her accident. It did not take a longer amount of time for her to operate the welder and she used the same operating routine as always. (*Id.* at 66–67.)

### Discussion

Snow first contends that it is entitled to summary judgment on Ms. Whitaker's breach of warranty claim. Ms. Whitaker does not argue otherwise, and the court agrees. The limitations period for a claim based on breach of an implied warranty is four years. IND.CODE § 26–1–2–725(1) ("An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued.") "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made...." IND.CODE § 26–1–2–725(2). It is undisputed that Snow tendered delivery to Walker on May 27, 1988, more than four years prior to the commencement of this action. Therefore, the statute of limitations bars Ms. Whitaker's breach of warranty claim.

■ Snow next contends that it is entitled to summary judgment on Ms. Whitaker's strict liability claim. That claim is governed by Indiana's Product Liability Act (the "Act"). IND.CODE § 33–1–1.5–1 *et seq.* At the time of the accident giving rise to Ms. Whitaker's complaint, the Act provided, in pertinent part as follows:

(a) One who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer ... is subject to liability for physical harm caused by that product to the user or consumer ... if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition, and if:

(1) The seller is engaged in the business of selling such a product; and

(2) The product is expected to and does reach the user or consumer without substantial alteration in the condition in which it is sold by the person sought to be held liable under this chapter.

IND.CODE § 33–1–1.5–3(a). To prevail on a claim under the Act, a plaintiff must prove the following elements: (1) that the seller was engaged in the business of selling the particular product which is the subject of the litigation; (2) that the seller placed the product into the stream of commerce; (3) that the product had a defective condition [1] that made it unreasonably dangerous to a foreseeable user when it was placed into the stream of commerce; (4) that the product was the proximate cause of the plaintiff's injuries; and (5) that the product was not substantially altered when it reached the user or consumer of the product. *See, e.g., Leon v. Caterpillar, Indus., Inc.,* 69 F.3d 1326, 1338 (7th Cir. 1995); *Underly v. Advance Mach. Co.,* 605 N.E.2d 1186, 1189 (Ind.Ct.App.1993), *trans. denied.*

Snow contends that it is entitled to summary judgment on Ms. Whitaker's strict liability claim because it did not place a product into the stream of commerce and did not install a defective product in the seam welder. Snow also contends that none of the replacement parts which it installed were the proximate cause of the accident giving rise to Ms. Whitaker's injuries. Finally, Snow argues that Ms. Whitaker cannot assert a failure to warn claim in connection with the replacement parts that it installed.

Ms. Whitaker maintains that there is a genuine issue of material fact as to whether Snow placed a new product into the stream of commerce by performing extensive reconditioning work on the seam welder and returning the welder to Walker. She also argues that there is a genuine issue of material fact as to whether Snow breached its duty to properly inspect the seam welder and report any safety violations to Walker.

### Stream of Commerce

█ Snow maintains that it did not place the seam welder into the stream of commerce. It argues that the case law requires a possessory interest to establish that a product has been placed into the stream of commerce and that because it did not sell, lease, or bail the seam welder, it did not place the seam welder into the stream of commerce. It is well-established that a commercial sale is not an essential element for products liability under Indiana law. *Gilbert v. Stone City Const. Co.,* 357 N.E.2d 738, 742 (Ind.Ct.App.1976); *Link v. Sun Oil Co.,* 160 Ind.App. 310, 312 N.E.2d 126, 130 (1974); *Perfection Paint & Color Co. v. Konduris,* 147 Ind.App. 106, 258 N.E.2d 681, 688 (1970). As explained in *Link,* "the product need not be actually sold if it has been injected into the stream of commerce by other means. The test is not the sale, but rather the placing in commerce." *Link,* 312 N.E.2d at 130 (citing *Perfection Paint & Color Co. v. Konduris,* 147 Ind.App. 106, 258 N.E.2d 681, 686, 688 n. 2 (1970)); *see also Gilbert,* 357 N.E.2d at 742. Thus, although Ms. Whitaker need not show that Snow sold a product, she must show that Snow introduced a product into the stream of commerce "by some other means."

█ Ms. Whitaker contends that Snow placed the welder into the stream of commerce "by other means," that is, "by performing extensive reconditioning work on the welder." However, she cites no authority to support her contention that "other means" can be equated with mere reconditioning or refurbishing, and the court's own research has revealed no such controlling authority. On one hand, Ms. Whitaker argues that by refurbishing the seam welder Snow created a new product under the Act; on the other hand, she argues that by refurbishing the welder Snow placed a product into the stream of commerce. Neither case law nor

---

**1.** "A product is in a defective condition ... if, at the time it is conveyed by the seller to another party, it is in a condition: (1) Not contemplated by reasonable persons among those considered expected users or consumers of the product; and

(2) That will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption." IND.CODE § 33–1–1.5–2.5(a).

logic supports the proposition that the mere act of refurbishing the welder simultaneously created a product under the Act *and* caused that product to be placed into the stream of commerce.

■ Under the rules of statutory construction, a statute must be read as a whole and, where possible, every word should be given effect and meaning. *Spaulding v. International Bakers Servs., Inc.*, 550 N.E.2d 307, 309 (Ind.1990); *Skrzypczak v. State Farm Mut. Auto. Ins. Co.*, 668 N.E.2d 291, 295 (Ind.Ct.App.1996). If the act of refurbishing accomplished both requirements—creating a new product and placing that product into the stream of commerce—then one of the Act's requirements would necessarily be superfluous. Under Ms. Whitaker's interpretation of the Act's language, assuming the other elements of the Act are met, a manufacturer of a product would always be liable because the act of manufacturing a product would be equated with placing the product into the stream of commerce "by other means." Thus, the language "puts into the stream of commerce" becomes superfluous. And, similarly, anyone who rebuilt a product would be liable under the Act even if that product were never sold, leased, bailed, or otherwise placed into the stream of commerce. The result compelled by equating an act of refurbishing with putting a product into the stream of commerce defies logic. The court is not persuaded that the refurbishing work performed on the seam welder by Snow can be equated with placing the seam welder into the stream of commerce by other means.

None of the cases relied upon by Ms. Whitaker supports her contention that a product is placed into the stream of commerce through the process of repair or refurbishment. See *Gilbert v. Stone City Const. Co.*, 171 Ind.App. 418, 357 N.E.2d 738, 742 (1976); *Link v. Sun Oil Co.*, 160 Ind.App. 310, 312 N.E.2d 126, 130 (1974); *Perfection Paint & Color Co. v. Konduris*, 147 Ind.App. 106, 258 N.E.2d 681, 688 (1970). The stream of commerce test was satisfied in *Gilbert* because the defendant leased the allegedly defective product. *Gilbert*, 357 N.E.2d at 742. In *Link*, the court held that the evidence failed to establish that the defendant sold the injury-causing inner tube; therefore, the court held that the plaintiff failed to show that the defendant injected the inner tube into the stream of commerce. *Link*, 312 N.E.2d at 130. In *Link*, the plaintiff's father was injured when the tire which he was attempting to mount onto a truck exploded. 312 N.E.2d at 128. Evidence was presented that the tire had been taken to the defendant for repair and that an employee of the defendant repaired the tire by replacing the inner tube. *Id.* Although the court indicated that the evidence failed to establish that the defendant repaired the tire, the plaintiff did not argue that the defendant was liable merely because it repaired the tire, and the court did not discuss the impact, if any, that repairing the tire would have had on its stream of commerce analysis. *Id.* at 129–30. Thus, *Link* does not support the argument that merely repairing or refurbishing a product constitutes the placing of that product into the stream of commerce.

*Perfection Paint* illustrates a case in which a product was placed in the stream of commerce by means other than sale, lease, or bailment. The plaintiff brought a products liability action on behalf of his father who died from burns he suffered in a fire in the plant of his employer, Alrimo Pizza, Inc. The defendant, Perfection Paint, had furnished Alrimo with a lacquer reducer for the purpose of removing a paint film on Alrimo's storage room floor. The lacquer was highly flammable and was ignited by a gas water heater in the storage room, thus causing the fire that resulted in the death of the plaintiff's father. 258 N.E.2d at 683. The court held that Perfection Paint's gratuitous furnishing of the lacquer reducer constituted a transaction which satisfied the requirement that the product be placed in the stream of commerce. 258 N.E.2d at 688. The court noted that Perfection Paint recommended the use of its epoxy application on concrete floors. Alrimo purchased the epoxy and, because the epoxy was unsatisfactory, Perfection Paint furnished the paint remover, thinner, and lacquer reducer free of charge to remove the paint and paint film. 258 N.E.2d at 684, 688. The court determined that although the lacquer was not sold, it was

placed in the hands of a consumer. *Id.* The court reasoned that the furnishing of the lacquer reducer by Perfection Paint was a continuing and integral part of the original sales transaction for the epoxy. 258 N.E.2d at 688.

The present case is readily distinguishable from *Perfection Paint.* The essence of the transaction at issue in Perfection Paint was the supplying of a product, the lacquer remover, by Perfection Paint to Alrimo. That the product was provided free of charge was irrelevant. In this case, the evidence does not support a finding or reasonable inference that the essence of the transaction between Snow and Walker was the provision of any product; rather, the essence was the provision of Snow's services for repair and refurbishing. Further, the specific transaction involving the lacquer remover was a continuing and integral part of the original transaction—unquestionably a sales transaction, that is, the sale of the epoxy. There is no evidence here that the transaction which provided for Snow's services was a continuing and integral part of an original sales transaction.

Ms. Whitaker's reliance on *Anderson v. Olmsted Util. Equip., Inc.,* 60 Ohio St.3d 124, 573 N.E.2d 626, 629–30 (1991), and *Michalko v. Cooke Color and Chem. Corp.,* 91 N.J. 386, 451 A.2d 179, 183 (1982), is also misplaced. *Anderson* held that a company which contracted with a city to remanufacture, inspect, and rebuild an aerial device which it then mounted on a truck it replaced could be held strictly liable in tort even though it did not sell the aerial device. 573 N.E.2d at 629. *Anderson* did not hold that a product is placed in the stream of commerce by the act of refurbishing the product. In any event, the *Anderson* court concluded that the allegedly defective aerial device was actually sold. 573 N.E.2d at 631. Here, there is no evidence which would support a finding or reasonable inference that Snow sold the seam welder to anyone.

The court rejects Ms. Whitaker's argument that any distinction between the amount of work performed by the defendant in *Anderson* and the amount performed by Snow creates a genuine issue of material fact as to whether Snow placed the seam welder into the stream of commerce. Although the *Anderson* court rejected the defendant's argument that strict liability was inapplicable because it did not actually sell the aerial device, the court determined that the defendant was a manufacturer because it completely rebuilt and remanufactured the aerial device, thus creating a new product. *Anderson,* 573 N.E.2d at 629–31. Similarly, the defendant in *Michalko* rebuilt the allegedly defective machine and manufactured component parts it placed on the machine. The present case is factually distinguishable because Snow did not completely rebuild or remanufacture the seam welder and did not manufacture any of the component parts it installed on the welder. Further, neither *Anderson* nor *Michalko* are binding on this court's decision.

*Wenger v. Weldy,* 605 N.E.2d 796 (Ind.Ct. App.1993), *trans. denied,* and *Denu v. Western Gear Corp.,* 581 F.Supp. 7 (S.D.Ind.1983), relied upon by Ms. Whitaker on other issues, actually support Snow's position on the stream of commerce test. In *Wenger,* Lowell, a farm implement dealer, welded a broken hitch on his hay baler. He subsequently leased the baler to his son. During use, the hitch separated, causing injury. *Wenger,* 605 N.E.2d at 797, 798. Similarly, the printing press that caused the injury in *Denu* was reconditioned and subsequently sold. *Denu,* 581 F.Supp. at 7. Thus, the court concluded that the press had been reintroduced into the stream of commerce. *Denu,* 581 F.Supp. at 8. The court held that there was a genuine issue of fact as to whether the reconditioned printing press which was reintroduced into the stream of commerce was a new product under the Act. *Id.* In this case, however, there is no evidence that Snow either sold, leased, or bailed the seam welder to Walker after refurbishing it. Nor is there any evidence that the seam welder was otherwise introduced (or reintroduced) into the stream of commerce after the refurbishing work was performed by Snow.

### The Product/Service Distinction

■ Snow contends that it cannot be held liable under the Act because the essence of the work it performed on the seam welder

for Walker was the sale of a service rather than a product. It contends that it did not sell any product to Walker and that it did not design or manufacture any of the parts it added to the seam welder. Ms. Whitaker, on the other hand, argues that by reconditioning the seam welder, Snow created a new product under the Act.

The Act defines a "product" as "any item or good that is personalty at the time it is conveyed by the seller to another party. It does not apply to a transaction that, by its nature, involves wholly or predominantly the sale of a service rather than a product." IND.CODE § 33–1–1.5–2; *see, e.g., Sapp v. Morton Bldgs., Inc.,* 973 F.2d 539 (7th Cir. 1992) (holding the Act inapplicable to a transaction that was primarily a sale of a service rather than a product); *Hill v. Rieth–Riley Constr. Co.,* 670 N.E.2d 940, 943 (Ind.Ct.App. 1996). Under the language of the Act in effect at the time of the occurrence in this case, "seller" was defined as "a person engaged in business as a manufacturer, a wholesaler, a retail dealer, a lessor, or a distributor." IND.CODE § 33–1–1.5–2. Snow does not dispute that it is engaged in business as a manufacturer—a designer and builder—of welding equipment.

Although no case is directly on point, Indiana and Seventh Circuit case law is instructive on the products/services distinction under the Act. Recently, the Indiana Court of Appeals in *Hill v. Rieth–Riley Constr. Co.,* 670 N.E.2d 940 (Ind.Ct.App.1996), considered whether repair and reinstallation work amounted to the sale of a product under the Act. Kathryn Hill was injured in a motor vehicle accident when she veered off the roadway and struck the buried end treatment of a guardrail, causing her vehicle to flip onto its side. Rieth–Riley had contracted to resurface the segment of the highway where the accident occurred; the resurfacing required the removal and resetting of the guardrails. Rieth–Riley subcontracted with Hoosier to remove and reset the guardrails as necessary. *Id.* at 942. The Hills claimed that Rieth–Riley and Hoosier were liable under the Act because they manufactured and installed 31 new concrete plugs and replaced rusted rails of the guardrail where the accident occurred. 670 N.E.2d at 943. Rieth–Riley and Hoosier argued that the removal and resetting of the guardrails was merely a service and not within the definition of product under the Act. *Id.* at 943. The court concluded that the removal and resetting of guardrails was incidental to the resurfacing of the highway, which Hill conceded was a service. *Id.* The court observed that even though 31 new concrete plugs were installed and some rusted rails were replaced, "there was no evidence that the contract was not 'for the most part' about the service of resurfacing the roadway." *Hill,* 670 N.E.2d at 943. Relying on *Sapp v. Morton Bldgs., Inc.,* 973 F.2d 539 (7th Cir.1992), the court held that the work performed was not a product; therefore, recovery was not allowed under the Act. *Hill,* 670 N.E.2d at 943.

*Sapp* involved a similar issue. In that case, the question was whether a contract involving the installation of channel iron in a barn for purposes of remodeling the barn into a stable was predominately the sale of a service or a product. All of the materials, except doors and windows, used to remodel the barn were manufactured and custom fitted at the site by Morton Buildings. Although materials manufactured by Morton were used extensively throughout the barn, the court held that Morton's remodeling of the barn was a transaction involving predominately the sale of a service rather than a product, and affirmed the district court's grant of summary judgment in favor of Morton. 973 F.2d at 541–42. The court relied on the fact that Morton had custom designed and fit their materials to the specifications of the barn. 973 F.2d at 542.

In the present case, the refurbishing work performed by Snow is analogous to the resurfacing of the roadway in *Hill* and the remodeling of the barn in *Sapp.* However, the evidence in this case indicates that Snow used new materials less extensively than the defendant in *Sapp* and that Snow's use of new materials was more closely analogous to that described in *Hill.* Thus, the refurbishing of the seam welder is even more predominantly the sale of a service than the remodeling of the barn in *Sapp.* Further, Snow's design work to accommodate the component

parts specified by Walker is comparable to the custom design and fitting that Morton performed to fit the specifications of Sapp's barn. The installation of a few component parts and the design work to fit Walker's specifications does not alter the predominate nature of the contract from the provision of a service to a sale of a product. Rather, the installation of those component parts and the design work was incident to the refurbishing work just as the removal and resetting of the guardrails was incident to the resurfacing work in *Hill*.

Ms. Whitaker's efforts to distinguish *Sapp* on the ground that the court analogized to a case decided under the real estate improvement statute are unpersuasive. The *Sapp* court expressly stated that its holding that the transaction was primarily a sale of a service and not a product was "fortified" by analogy to service-like activities identified as falling under the real estate improvement statute. 973 F.2d at 542. The analogy to service-like activities under the real estate improvement statute was not critical to the court's holding.

The case of *Barry v. Stevens Equip. Co.*, 176 Ga.App. 27, 335 S.E.2d 129 (1985), supports Snow's position. The *Barry* court held that a repairer that completely rebuilt a machine was not a "manufacturer" under the Georgia statute governing strict product liability. 335 S.E.2d at 131. The court reasoned that although the defendant may have assembled component parts, it did not do so with the purpose of having the machine sold as new property. The court concluded that the transaction was for repair services rather than for the sale of a rebuilt machine and, therefore, held that the defendant was not strictly liable. *Id.* Despite the Georgia statute's requirement of an actual sale, *Barry* is instructive in this case where a sale is not essential under the Act. Assuming that a sale was not an essential requirement, the defendant would not have been held strictly liable because the transaction in that case was a transaction for services rather than a product. *Id.* As in *Barry*, the transaction involving the seam welder was one for services rather than for the sale of a product.

Moreover, *Lilge v. Russell's Trailer Repair, Inc.*, 565 N.E.2d 1146 (Ind.App.1991), upon which Ms. Whitaker relies, is distinguishable. In *Lilge* the defendant refurbished a truck by installing a rear cargo box and a bumper. The plaintiff, a delivery driver, was injured when he stepped down to the bumper from the back of the rear cargo box. 565 N.E.2d at 1148. The defendant contended that it was not liable under the Act because its refurbishing work was predominantly the sale of a service. *Id.* at 1149. The court reversed the summary judgment for defendant, holding that there was a genuine issue of material fact as to whether the defendant had manufactured the bumper that it installed. *Id.* The court explained that the resolution of that issue could "determine whether the transaction was predominantly the sale of a service rather than a product." *Lilge*, 565 N.E.2d at 1149. However, there is no question in the present case as to whether Snow manufactured any of the component parts it installed on the seam welder.

Ms. Whitaker's attempt to establish that Snow created a new product under the Act is also unavailing. Reconditioning or reconstruction of a product, as opposed to mere repair, "which has *the effect* of lengthening the useful life of a product beyond what was contemplated when the product was first sold" creates a new product under the Act. *See Richardson v. Gallo Equip. Co.*, 990 F.2d 330, 331 (7th Cir.1993) (emphasis added); *Denu v. Western Gear Corp.*, 581 F.Supp. 7, 8 (S.D.Ind.1983); *Wenger v. Weldy*, 605 N.E.2d 796, 797 (Ind.Ct.App.1993) (dicta), *trans. denied.* Snow replaced parts of the seam welder as requested by Walker, replaced other parts as it deemed necessary, and performed some design work. Although there is evidence that the repair and refurbishing work performed by Snow was anticipated to lengthen the useful life of the seam welder, Ms. Whitaker has offered no evidence that the work performed by Snow actually lengthened the welder's useful life. The evidence establishes that the seam welder was not obsolete and had useful life remaining when Snow received it. A finding that the work performed by Snow had the effect of lengthening the seam welder's use-

ful life would be based upon mere speculation. Further, as discussed *infra*, in each case relied upon by Ms. Whitaker, the replacement component part that extended the useful life of the product was the proximate cause of the resulting injury. Not so here.

Ms. Whitaker has presented no evidence indicating that the transaction between Snow and Walker was not predominantly about the service of refurbishing the welder. Therefore, she cannot prevail on her claim against Snow because the refurbishing work performed by Snow does not fall within the definition of a product under the Act. For this reason, Snow's motion for summary judgment must be granted.

### Proximate Cause and Failure to Warn

Snow maintains that it is not liable under the Act because none of the component or replacement parts it added to the seam welder were the proximate cause of the accident which resulted in Ms. Whitaker's injuries. It claims that neither a component part nor the seam welder itself failed, and that the Act is inapplicable because there was no product failure.

■ The law is now clear that a defendant that repairs or refurbishes a machine may not be held strictly liable because it added a component part to the machine, unless the part was defective and was the proximate cause of the plaintiff's injury. *See Richardson v. Gallo Equip. Co.*, 990 F.2d 330, 331–32 (7th Cir.1993); *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1282–83 (7th Cir.1985); *Hinds v. CompAir Kellogg*, 776 F.Supp. 1102, 1107–08 (E.D.Va.1991), *aff'd*, 961 F.2d 211 (4th Cir. 1992); *Denu v. Western Gear Corp.*, 581 F.Supp. 7, 8 (S.D.Ind.1983); *Wenger v. Weldy*, 605 N.E.2d 796, 797 (Ind.Ct.App.1993), *trans. denied.* In *Richardson*, the plaintiff did not hear the back-up alarm on a forklift which was being operated by a co-worker and the forklift backed over the plaintiff causing him injury. The forklift was manufactured and originally sold to defendant Gallo. Gallo subsequently equipped the forklift with a back-up alarm and leased the forklift to the plaintiff's employer. The accident occurred more than ten years after the original delivery of the forklift by the manufacturer

to Gallo, but less than ten years after Gallo delivered the improved forklift to the plaintiff's employer. *Richardson*, 990 F.2d at 331. The district judge found that the back-up alarm installed by Gallo was not defective and entered summary judgment in Gallo's favor. The Seventh Circuit held that a manufacturer of a component part incorporated into a machine may be held liable under the Act if the component was defective and caused injury. *Richardson*, 990 F.2d at 331–32. The court reasoned:

> Unless the component is defective and caused the injury, the suit is barred by the statute of repose because then the defect must have been in the original product; and, to repeat an essential point in this opinion, merely adding a component, without extending the life of the original product (not here alleged), does not affect the statute of repose.

*Richardson*, 990 F.2d at 332.

Similarly, in *Black v. Henry Pratt Co.*, 778 F.2d 1278 (7th Cir.1985), the court noted that certain replacement parts which had been supplied by the manufacturer of a valve functioned as they were designed, and that it was only the malfunction of an unrelated part of the valve which led to the deaths of the plaintiffs' decedents. *Black*, 778 F.2d at 1283. The court noted that in each case relied upon by the plaintiffs in which the court imposed liability upon a manufacturer of a component part, the part itself was found to be unreasonably dangerous or defective and was the cause of the injury complained of. *Id.* The court further observed that the plaintiffs had "failed to provide this court with any authority to support the proposition that the sale of components—replacement parts—totally unrelated to the alleged defect or unreasonably dangerous condition existing in the original product constitutes the sale of an unreasonably dangerous and defective product...." *Black*, 778 F.2d at 1283. See also *Hinds v. CompAir Kellogg*, 776 F.Supp. 1102, 1107–08 (E.D.Va.1991) (holding that Indiana's ten-year statute of repose barred a products liability action even if replacement parts were sold within ten years, absent any evidence that the replace-

ment parts were defective), *aff'd*, 961 F.2d 211 (4th Cir.1992).

Ms. Whitaker has not alleged that any of the design work or the replacement parts installed by Snow were defective.[2] Nor has she alleged that any of those component parts caused her injury. Instead, she argues that even if none of the components added by Snow were defective, the seam welder was in a defective and unreasonably dangerous condition because it did not have adequate guarding for potential pinch points and because of Snow's alleged failure to warn of those potential pinch points.

■ Ms. Whitaker's failure to warn claim must also fail. In *Dague v. Piper Aircraft Corp.*, 275 Ind. 520, 418 N.E.2d 207 (1981), the Indiana Supreme Court held that the limitations provision of the Act barred all products liability actions regardless of whether the theory of liability was strict liability or failure to warn. *Dague*, 418 N.E.2d at 211–12. Other courts, including the Seventh Circuit, have agreed with and relied upon *Dague*. *See, e.g., Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1221–22 (10th Cir.1991) (holding that Indiana's Products Liability Act's statute of repose barred a failure to warn claim against the defendant, the original manufacturer of an aircraft that subsequently provided an allegedly defective handbook, concerning conditions in the aircraft that existed at the time of original manufacture and delivery of the aircraft); *Black*, 778 F.2d at 1283–1284 (holding that plaintiffs' failure to warn claims were barred by Act's ten-year statute of repose); *cf. Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 604 F.2d 950 (5th Cir.1979), *opinion amended*, 609 F.2d 820 (5th Cir.1980) (holding that under Mississippi law, one who merely repairs and installs products is not strictly liable for failing to correct or warn of products' pre-existing defective condition).

In *Black*, the court held that the supplier of the replacement parts had a duty to warn "only if [the parts] were in fact defective and thus dangerous for the use for which they were supplied." *Black*, 778 F.2d at 1283.

The court noted that the replacement parts in question were not defective and, therefore, not dangerous in themselves and were not related to the functioning of the mechanism which caused or contributed to the accident. *Id.* The court concluded that the defendant's failure to give any warnings could not render the replacement parts unreasonably defective and dangerous. The court held, therefore, that because the replacement parts were neither unreasonably defective and dangerous nor related to the cause of the accident, the plaintiffs' action based on failure to warn was barred under the Act. *Black*, 778 F.2d at 1283–84. See also *Hinds v. CompAir Kellogg*, 776 F.Supp. 1102, 1107–08 (E.D.Va. 1991) (following *Black*).

■ Here, there is no claim that any component part installed by Snow or any design work performed by Snow was unreasonably dangerous and defective. Nor is there a claim that any such component part or design work caused Ms. Whitaker's injury. It is undisputed that Ms. Whitaker was not injured while she was engaged in the actual welding process; instead, she was injured while reaching into the welder to knock weld beads off the wheel. It is undisputed that at the time of the accident, the seam welder did not perform any differently than it had previously and it did not take a longer amount of time for the welding process. Under *Richardson* and *Black*, Snow may not be held liable "unless the component is defective and caused the injury ... because then the defect must have been in the original product...." *Richardson*, 990 F.2d at 332. Because neither the component parts installed by Snow nor the design work it performed were the cause of Ms. Whitaker's accident, Snow had no duty to warn upon performing its refurbishing work. Assuming that Snow failed to either guard against potential pinch points or give Walker any warnings concerning potential pinch points and safety violations, that failure could not render the component parts or design work unreasonably defective and dangerous. Therefore, Snow may not be held liable under the Act.

---

2. In fact, Ms. Whitaker concedes in her supplemental memorandum, that she does not claim that any particular component part of the seam welder failed. (Supp.Mem. in Opp. to Mot. for Summ. J. at 9.)

Ms. Whitaker has not alleged that any of the replacement component parts installed by Snow on the seam welder were defective. Nor has she alleged that any of those component parts caused her injury. Indeed, there is no evidence that any of the parts themselves were either unreasonably dangerous and defective or the proximate cause of her injury. Rather, Ms. Whitaker argues that the seam welder was dangerous and defective because it did not have adequate guarding for potential pinch points and because of Snow's alleged failure to warn of those potential pinch points. The essence of Ms. Whitaker's claim is failure to warn of an alleged dangerous and defective condition—the lack of guarding of pinch points on the seam welder. Thus, any alleged defect that caused her injury would have existed in the seam welder as originally manufactured and delivered to Walker. At the very least, the alleged defect existed before Snow performed its refurbishing work on the seam welder and installed replacement component parts.

Under *Black,* Snow had a duty to warn when it repaired and refurbished the seam welder only if the replacement component parts it installed, or the design work it performed, or both, were in fact defective and thus dangerous for the use for which they were supplied. *Black,* 778 F.2d at 1283. The design work performed by Snow was not related to the electrical functioning of the seam welder, which ultimately caused the accident. Because neither the replacement parts installed by Snow nor the design work performed was the cause of Ms. Whitaker's accident, Snow had no duty to warn in connection with its repair and refurbishing work. As in *Black,* Snow's failure to give warnings does not render the replacement component parts that it installed or the design work it performed unreasonably defective and dangerous. Therefore, because the replacement parts and the design work were not both unreasonably defective and dangerous and related to the cause of Ms. Whitaker's accident, Ms. Whitaker's failure to warn claim is barred under the Act.

### Conclusion

For the foregoing reasons, defendant Snow's motion for summary judgment is GRANTED. The Clerk shall enter final judgment in favor of the defendants and against the plaintiff.

**SO ORDERED.**