Naomi WHITAKER, Plaintiff–Appellant,

v.

T.J. SNOW CO., Defendant–Appellee.

No. 97–1596.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1997.

Decided Aug. 6, 1998.

Edward L. Murphy, Jr., Larry L. Barnard (argued), Miller, Carson, Boxberger & Murphy, Fort Wayne, IN, Dale J. Starkes, Winamac, IN, for Plaintiff–Appellant.

John C. Hamilton (argued), John E. Doran, Doran, Blackmond, Ready, Hamilton & Williams, South Bend, IN, for Defendant–Appellee.

Before COFFEY, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

One unintended effect of the workers' compensation scheme in force in virtually every state has been to create an incentive for employees injured on the job to look for entities other than the employer who might be responsible (and able to pay) for the full consequences of their job-related injuries. The scope of products liability law, in turn, has in many cases pointed the way to potential defendants: even if the injured employee is limited in her remedies against the employer, she can require the company that manufactured an unreasonably dangerous product that caused her injuries to pay damages. That, in general, is what Naomi Whitaker is attempting to do in this case. While she was working at her job as a welder at the Walker Manufacturing Company, Whitaker's hand was injured by a machine that had been refurbished (but not originally manufactured) by appellee T.J. Snow Company about five years earlier. Whitaker's claim was tried with the consent of the parties before a magistrate judge, see 28 U.S.C. § 636(c), who eventually entered summary judgment for Snow. See *Whitaker v. T.J. Snow, Co.*, 953 F.Supp. 1034 (N.D.Ind.1997). Whitaker has appealed from that judgment.

The machine that injured Whitaker was a "catalytic converter seam welder" manufactured and sold in 1979 to Walker by RWC, Inc. (which originally was also a defendant, but is now out of the case). In February or March 1988, Walker decided to upgrade the electrical circuits of the seam welder, and it solicited a bid for that work from Snow. In the request for bids, Walker specified all equipment that was to be used in the project. Snow responded with a shop order dated April 15, 1988, which stated that Snow would add to the machine Walker's specified Gould three-axis programming unit, install a new water circuit, air circuit, and Weltronic WT–900 weld control, design and build a water catch basin/tray with outlet, and clean and paint the machine. The shop order also specifically said that "[t]he basic welder [was] ... not to be rebuilt." Walker accepted Snow's bid, and work proceeded according to plans. Snow performed some additional design work that enabled it to use the component parts Walker had specified. Snow did not design the component parts themselves, nor did it change the welder's mechanical function. The parties agree that the work Snow performed had the effect of extending the useful life of the machine, even though the machine had some useful life remaining when Snow received it. The total cost of the work Snow performed was $61,065; a new seam welder at the time would have cost about $100,000.

Snow returned the seam welder to Walker on May 27, 1988. Normally, before it returns something to a customer, Snow checks

over the item to see if it complies with all applicable safety regulations, including those issued by the Occupational Safety and Health Administration (OSHA), the American National Standards Institute (ANSI), and the Resistance Welders Manufacturers Association (RWMA). If Snow spots a problem, it usually tells the customer orally, and then follows up in writing. In this case, Snow was supposed to inspect the seam welder and determine if any guarding was necessary for so-called pinch points on the machine, and if so, either to furnish the guards or tell Walker they were needed. Although Snow inspected the machine, because the order was a rush job, it failed to install guards, to warn Walker orally or in writing, or to place warning stickers or decals on the exposed pinch points. This was unfortunate because the seam welder was not in compliance with OSHA regulations when Snow returned it to Walker. When Walker received the seam welder back from Snow, the only guarding on the pinch points were on the two hand controls—and even those guards were insufficient under the relevant OSHA regulations. This non-compliance with OSHA regulations may not have been unusual, however, because by industry convention the customer normally shipped Snow a "bare bones" machine, and the customer retained the responsibility for re-installing the guards afterwards. That is precisely what occurred in the case of the seam welder that injured Whitaker.

As of the day of the injury, September 18, 1993, Whitaker had been a Walker employee for only six days; she had operated the seam welder for five of those days. On the second day of her employment, Tim Kaizer (whose name is spelled several ways in the record), another Walker employee, had showed her how to operate the seam welder and how to examine the weld. Other Walker employees instructed Whitaker what to do when, during the welding process, small molten particles of metal spattered on the seam welder's wheels. When this happened, Whitaker was told to chisel the metal beads off the wheel. The accident did not occur while she was actually in the process of welding. Instead, it occurred after she observed spattered metal adhering to the wheels and, as she had been instructed, she reached inside an opening on the seam welder to attempt to knock the weld beads off with a chisel. Unfortunately, the seam welder was in the middle of a weld cycle, and while she was doing this, the machine re-activated and caught her left hand in a pinch point, breaking her left index and middle fingers.

■ She eventually sued Snow (among others) under the diversity jurisdiction, 28 U.S.C. § 1332. Whitaker is a citizen of Indiana, and Snow is a Tennessee corporation with its principal place of business in Tennessee; the amount in controversy exceeded $50,000, the jurisdictional amount required at the time the suit was filed. Although Whitaker's amended complaint pleaded only a warranty theory, Snow's motion for summary judgment briefed both this issue as well as a claim under Indiana's Strict Product Liability Act. See generally Ind.Code § 33–1–1.5–1 et seq. (1997). Because both parties squarely addressed the strict liability theory in their summary judgment briefs, the complaint was constructively amended to include that claim. See *Walton v. Jennings Community Hosp.*, 875 F.2d 1317, 1320 (7th Cir.1989) (complaint was amended where plaintiff pleaded contract-based theory but at briefing on summary judgment both parties and the judge joined issue on a tort-based theory). *Cf.* Fed. R.Civ.P. 15(b).

■ On appeal, Whitaker has abandoned her warranty claim (which the district court in any event had barred on statute of limitations grounds) and limited her arguments to Snow's tort liability. She argues principally that the district court should have found genuine issues of material fact pertinent to the strict liability claim. This issue was properly raised below and we may review the disposition of that claim now. In addition, in her brief and at oral argument Whitaker attempted to smuggle into the case an argument based on Snow's alleged negligence. As noted before, however, her complaint did not include a negligence-based count. While conceding this fact, Whitaker argues that (like the strict liability claim) the issue of negligence was tried by consent

when she presented negligence theories in her response to Snow's motion for summary judgment and again later in a "Statement of Genuine Issues" filed with the court. This argument, however, overlooks the fact that "[a] plaintiff may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment." *Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir.1997), quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996). Such eleventh hour amendments should ordinarily be presented to the district court, which has discretion to grant or deny the motion. *Cf. Shanahan*, 82 F.3d at 781. Because Whitaker did not seek leave to add the negligence count but instead merely inserted the claim in her brief in opposition to summary judgment, and because unlike the strict liability count Snow did not join issue with Whitaker on the improperly appended negligence claim, Whitaker waived this theory of recovery and we do not consider it further.

■ The Indiana Strict Product Liability Act, which we set forth here in pertinent part, makes certain parties liable for injuries caused by their products without regard to ordinary principles of fault:

> (a) [A] person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to the user's or consumer's property is subject to liability ... if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition, and if:
>> (1) the seller is engaged in the business of selling such a product; and
>> (2) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which it is sold by the person sought to be held liable under this chapter.

Ind.Code § 33–1–1.5–3 (1997). In order to prevail under this law, a plaintiff must prove that: (1) the product was defective and unreasonably dangerous; (2) the defective condition existed at the time the product left the defendant's control; and (3) the defective condition was the proximate cause of the plaintiff's injuries. See *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 160 (Ind.Ct.App.1997).

The district court found that Snow was entitled to summary judgment for several reasons. First, it found that Snow had neither sold, leased, nor otherwise placed the seam welder into the stream of commerce when it performed the refurbishing work and returned the machine to Walker. Second, it found that because the work Snow performed was predominantly a "service" rather than the manufacture of a "product," it fell outside the scope of the Strict Product Liability Act. Finally, because (both parties agree) there was nothing defective about the design work or the replacement parts Snow installed, and because they did not cause her injury, Whitaker could prove neither proximate cause nor the elements of a failure to warn claim. Whitaker naturally takes issue with all three conclusions.

■ We focus here on the product/service distinction, which governs the applicability of the statute. Unless we find that the contract taken as a whole concerned the sale, lease, or other placement into the stream of commerce of a *product*, all of Whitaker's other arguments are moot. The Indiana Strict Product Liability Act makes clear that it does not apply to transactions that, by their nature, "involve[ ] wholly or predominantly the sale of a service rather than a product." Ind. Code § 33–1–1.5–2(6) (1997). The Walker–Snow transaction was obviously not *wholly* for the sale of a service because Snow procured and installed certain component parts in the seam welder. The question therefore is whether the transaction was *predominantly* for the sale of a service, for purposes of the Indiana statute.

Trying to tell the difference between a product and a service may not be harder than deciding if a glass is half full or half empty, or if a tomato is better characterized as a fruit than as a vegetable, but it is certainly not easy. See, *e.g.*, William C. Powers, Jr., *Distinguishing Between Products and Services in Strict Liability*, 62 N.C.L. Rev. 415 (1984). Indiana courts have taken a number of different approaches

to the question. In *Hill v. Rieth–Riley Constr. Co.*, 670 N.E.2d 940 (Ind.Ct.App. 1996), the court looked to see which aspect of the contract was "predominant." It concluded the plaintiff could not bring a product liability claim based on the defendant's installation of concrete plugs and guardrails because those actions had been performed pursuant to the defendant's contract with the state Department of Transportation to resurface a highway, a contract that had been predominantly for services. *Id.* at 943. Similarly, in this court's decision in *Sapp v. Morton Bldgs., Inc.*, 973 F.2d 539 (7th Cir. 1992) (on which the *Hill* court relied in part), a contract for the remodeling of a barn and its conversion into a stable was characterized as a service because the construction of the interior structures had been "custom fit[ted]" to the site as part of the "remodel[ing]" service, rather than "prefabricated." *Id.* at 541–42. The *Sapp* court also found useful a federal district court's decision in *Grain Dealers Mut. Ins. Co. v. Chief Indus., Inc.*, 612 F.Supp. 1179 (N.D.Ind.1985), which also drew a distinction between the manufacture of standard, fungible products, and the process of custom-designing and fitting an improvement to a particular piece of real estate. *Id.* at 1183. In another case, the Indiana Court of Appeals looked for guidance to the Uniform Commercial Code to reinforce its decision that a physician's incidental act of furnishing goods to a patient was not actionable under the Strict Product Liability Act. *Dove v. Ruff*, 558 N.E.2d 836, 839 (Ind.Ct. App.1990), citing *Preston v. Thompson*, 53 N.C.App. 290, 280 S.E.2d 780 (1981). Article 2 of the UCC applies only to sales of goods, and it is often necessary to decide whether a contract that involves both goods and services falls within its terms. In a manner analogous to the approach of the cases here, Indiana courts ask whether the "predominant thrust" of the contract is for the sale of goods or the rendering of services. See *Insul–Mark Midwest, Inc. v. Modern Materials, Inc.*, 612 N.E.2d 550, 553–54 (Ind.1993) (adopting the rule for the UCC).

Perhaps most useful to Whitaker is the Indiana Court of Appeals decision in *Lilge v. Russell's Trailer Repair, Inc.*, 565 N.E.2d 1146 (Ind.Ct.App.1991). In that case, Harry Lilge, a truck driver, was injured when he fell from the back bumper of his truck while making a delivery. *Id.* at 1148. Prior to his fall, the truck had been refurbished by Russell's Trailer Repair, Inc., which had installed the bumper as part of the job. *Id.* The court found that there was an issue of material fact over whether the reconditioning job on the truck was a "product" or a "service" for purposes of the Strict Product Liability Act. *Id.* at 1149. The record did not show whether Russell's had manufactured the bumper, or if it had merely transferred the bumper from one truck chassis to another. If the former were true, the court implied, then Russell's would have predominantly furnished a product and the statute would apply. *Id.* If the latter were the case, the entire transaction would be outside the Strict Product Liability Act. *Id.* On those facts, where it was unclear precisely what work Russell's had done regarding the bumper, the court in *Lilge* reversed the lower court's grant of summary judgment.

Whitaker's case is different from *Lilge* in several critical respects. Unlike the plaintiff in *Lilge*, Whitaker did not allege that Snow manufactured any of the significant component parts used to refurbish the seam welder. Instead, Snow's work was principally the installation of components according to Walker's custom specification. Additionally, the contract itself makes clear that Snow was not being asked to "rebuild" the machine. As the purchase order put it, this was a "retrofit" and a "modification," and in fact the shop order amplified on this when it stated that "[t]he basic welder is not to be rebuilt." When the work was done, Snow returned to Walker the same configuration of machine it had received. Whitaker urges that the contract between Walker and Snow was predominantly for a "product" because the refurbishment—which cost approximately 60% of the price of a brand new machine—added to the "useful life" of the seam welder. Although the useful life of the seam welder was undoubtedly extended, that fact does not persuade us that Snow was building a new machine for Walker. The key distinction is between the repair or improvement of an existing machine, and the construction or

rebuilding of a new machine. Even routine maintenance adds to useful life, in the sense that it assures the owner of a product that it will not collapse sooner than it should. While the "refurbishing" here went beyond routine maintenance, what Snow did under the contract was to replace certain component parts with others specified by Walker and to make sure the machine was working properly for Walker. This is more like the custom work performed by the company in *Sapp* than the manufacture of either a full seam welder or component parts for the machine. Thus, although as *Lilge* illustrates there are certainly cases where disputed issues of fact can prevent a judge from characterizing a transaction as involving predominantly a product or a service, we agree with the magistrate judge that no reasonable jury could find otherwise on the evidence presented.

Our conclusion that the contract between Snow and Walker was predominantly one for services disposes entirely of Whitaker's claims. There was no "product" as defined by the statute that Snow sold, leased, or placed into the stream of commerce, nor did any "product" created by Snow cause her injuries. It is important to recall for this purpose that aside from the negligence claim waived below, Whitaker is not arguing that Snow installed any defective parts or that its work was otherwise unsatisfactory. The entire theory of her case rests on the proposition that, given the extent of the work that Snow did, it was transformed into the manufacturer of the entire machine and is therefore liable for failing to make sure that parts of the seam welder unrelated to the work it performed had the proper guards and warnings affixed. We have rejected the premise of this argument, which means that the conclusion must also fall. Our decision also makes it unnecessary for us to decide whether Snow's actions could be seen by a trier of fact as the proximate cause of Whitaker's injury.

We therefore AFFIRM the judgment of the district court.