HEXAGON PACKAGING CORPO-
RATION, an Illinois Corpora-
tion, Plaintiff,

v.

MANNY GUTTERMAN & ASSOCI-
ATES, INC., of itself and d/b/a M.
Gutterman & Associates, Inc./Jelmar;
Jelmar, an Illinois partnership; Jamie
Industries, an Illinois corporation;
Arthur Gutterman, individually; Blid-
co Incorporated; Betty Day Company,
Inc.; Louis C. Day, Jr. and Margaret
Renfroe, as personal representatives
of the Estate of Betty Day; and Jo-
seph Ruth, individually, Defendants.

No. 96 C 4356.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 29, 2000.

Harold C. Wheeler, Kevin Jason O'Brien, Louis Joseph Aurichio, Harry Joshua Nelson, Randi L. Ellias, Butler, Rubin, Saltarelli & Boyd, Chicago, IL, for plaintiff.

Stephen A. Cohen, Gilbert W. Gordon, Spencer J. Marks, William V. Saracco, Marks, Marks, & Kaplan, Chicago, IL, for Manny Gutterman, Jelmar, Jamie Industries, Inc., Arthur Gutterman, defendants.

John Lawrence Conlon, Paul Joseph Gaynor, Schwartz, Cooper, Greenberg & Krauss, Chicago, IL, for Blidco Inc., Louis Day, defendants.

Eugene Frederick Frideman, Gail Tuler Friedman, Friedman & Friedman, Ltd., Chicago, IL, Stuart H. Wolf, Arlington Heights, IL, for Joseph Ruth, defendant.

Cory A. Johnson, Michael T. Hannafan & Associates, Ltd., Chicago, IL, for Margaret Renfroe, defendant.

Michael T. Hannafan, Micheal T. Hannafan & Assoc., Ltd., Chicago, IL, for Carlos Montejo, defendant.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

### INTRODUCTION

Before the court are two motions for summary judgment. One has been presented by Manny Gutterman & Associates, Inc., in its own name and doing business as M. Gutterman & Associates, Inc./Jelmar; Jelmar; Jamie Industries, Inc.; and Arthur Gutterman ("Gutterman"), individually (collectively, the "Gutterman defendants"). The second motion was filed by defendant Joseph Ruth ("Ruth").

The Gutterman defendants and Ruth have adopted each other's motions. Blidco Incorporated, Betty Day Company, Inc., the Estate of Betty Day, Louis C. Day, Jr. and Margaret Renfroe, as personal representatives of the Estate of Betty Day (the "Day Defendants"), have adopted both motions for summary judgment.

### BACKGROUND

The parties dispute almost every fact in this case and spin wildly different tales. The facts below are as set forth by Hexagon. The facts that are not disputed by the Gutterman defendants are specifically noted. *See Spolnik v. Guardian Life Insurance Co.,* 94 F.Supp.2d 998, 1000 (S.D.Ind.2000) ("The following facts are supported by proper citations to admissible evidence and are taken in the light most favorable to the Plaintiff, the non-moving party on the summary judgment

motion, with all reasonable inferences based on the facts drawn in his favor.").

### The Origin of Tarn–X and CLR

In 1964, Robert Edison founded the Hosiery Mate Company. Hosiery Mate developed and manufactured various chemical formulations for household and industrial cleaners and disinfectants. In 1967, Al Eicoff ("Eicoff") of the A. Eicoff & Co. advertising agency asked Dr. Sylvan Edison and his son Robert ("Edison") to develop a formula for tarnish remover. The resulting compound became known as "Tarn–X."

The Edisons and Eicoff agreed that the formula would be owned by Hosiery Mate and that Eicoff and his partners, Manny, Arthur and Steven Gutterman would be responsible for advertising and distributing Tarn–X. In 1969, the Gutterman defendants and Eicoff asked Robert Edison to develop a product that would remove calcium, lime scale and rust from a variety of surfaces. This second product became known as "CLR." Both products are at issue in this case. The Gutterman defendants dispute Hexagon's depiction of how the formula for Tarn–X originated.

Both parties agree that from 1967 through 1985, Hosiery Mate purchased the chemicals for and manufactured Tarn–X and CLR. Hosiery Mate sold the finished products to the Gutterman defendants, who, in turn, were responsible for marketing. During this time period, Edison kept the formulas for both Tarn–X and CLR in a fireproof, locked filing cabinet in his office. Only Edison had access to the files, and Edison instructed anyone with access to them to keep the formulas confidential. Hexagon admits that Edison gave the formulas to the Gutterman defendants in order to export the products abroad, but Hexagon avers that Edison ordered the formulas to be kept confidential.

In 1985, Edison formed Hexagon, and he assumed the role of chairman of the board and sole shareholder. In May 1985, Edison exclusively licensed and transferred the Tarn–X and CLR formulas to Hexagon and then appointed defendant Ruth as president of Hexagon. Edison instructed Ruth to keep the formulas for the two products confidential.

From 1985 through 1989, Hosiery Mate manufactured Tarn–X and CLR for Hexagon. Hence, it was Hosiery Mate who sold the finished product to the Gutterman defendants.

In the summer of 1986, Ruth introduced Betty Day ("Day") to Edison and recommended that Hexagon hire Day to perform quality control in manufacturing, to improve the existing products, and to develop new products for Hexagon. The Gutterman defendants reinforce that Hexagon had already arranged for Day to handle quality control before the Gutterman defendants themselves expressed their quality control concerns.

Edison authorized Ruth to hire Day; however, he instructed Ruth to tell Day, and he told Day himself, to keep the formulas for Tarn–X and CLR confidential. Day maintained an office at Hexagon and used Hexagon's laboratory. Edison introduced Day to Gutterman "soon thereafter." Hex. Resp. at 6.

### Quality Control

Edison acknowledges that he involved Day in the quality control of Tarn–X and CLR before the Gutterman defendants were involved. However, Hexagon argues that, at the insistence of the Gutterman defendants, it gave Day continued and increasing control, including that Day be responsible for releasing each batch and for filling, monitoring and checking each process on the line. Additionally, no batches were bottled until Day approved them. The Gutterman defendants respond that any quality control concerns that they expressed or that they suggested be handled by Day in 1987 was the result of production and manufacturing errors on the part of Hexagon.

During Day's employ at the Hexagon facility, she was retained as an indepen-

dent contractor by the Gutterman defendants from time-to-time to perform product development and testing functions. For example, the Gutterman defendants assert that Day was paid a consulting fee by them to develop Silver Glaze, Aluminum Glaze and Stainless Glaze. Hexagon counters that Day developed Silver Glaze from a formula for Super Tarn–X, which was developed by Dr. Berliner for Hosiery Mate, and that Hexagon owns all of the beneficial interests in the glazes, which for purposes of this motion, the court accepts as true.

### The Chemical Billing Scheme

In 1987, Day modified the CLR formula, adding a new detergent which she called "Comet–Acidet." Both parties agree that in 1989, Day invoiced Hosiery Mate for the detergent, sending invoices which showed purchases of Comet–Acidet by the "Betty Day Company."

Day later renamed Comet–Acidet the "CLR Detergent System"; however, neither detergent ever existed. Rather, Day was adding water or nothing to the old products yet claiming that the fictitious chemicals improved the final products or that they reduced the overall manufacturing costs. Both parties agree that from April 1989 to June 1996, the Gutterman defendants paid Day over four million dollars for the CLR Detergent System.

Since at least May 1989, the Gutterman defendants began to pay Day directly for the CLR Detergent System. It is undisputed that Gutterman became Day's primary contact at the Gutterman Companies, and Gutterman and Day enjoyed a close and mutually beneficial relationship. According to Hexagon, as part of the Gutterman/Day/Ruth scheme, Gutterman would pay Day for the nonexistent chemicals and then he would split the payment between himself, Day and Ruth.

Prior to September 1989, Hexagon sent detailed chemical inventories to the Gutterman defendants. However, on September 26, 1989, Gutterman met with Edison and proposed that Day and Ruth take over the chemical purchasing, the product pricing and the billing responsibilities from Hexagon. From then on, Edison understood that Ruth and Day would order the chemicals and Hexagon would bill the Guttermans directly for the finished Tarn–X and CLR.

After the September 26, 1989 meeting, it is undisputed that Day maintained the formulas for Tarn–X and CLR on her computer. Furthermore, both parties agree that Gutterman instructed Edison to cease sending the chemical inventories to him. The Gutterman defendants aver that instead they instructed Blidco, a company run by Day, to send chemical inventories because Blidco ordered the chemicals.

Apparently Day maintained two sets of formula books, one reflecting the actual Hexagon formulas, and the other containing formulas with fictitiously-named and nonexistent chemicals.

The Gutterman defendants add that they requested that Day assume responsibility for purchasing, pricing and billing because Edison and his companies were not paying the chemical vendor bills in a timely fashion and were causing a delay in the delivery of raw materials. Gut. 56.1(A)(3) ¶ 38. The Gutterman defendants were also concerned about rapidly increasing production demands and Hexagon's inability to keep up.

It is undisputed that thereafter, the Gutterman defendants also hired an inventory company, Accurate Inventory, to prepare the chemical inventories. The Gutterman defendants knew that Accurate Inventory's only experience was counting cigarettes and beverages for small convenience stores. The Gutterman defendants instructed Accurate not to conduct the inventory but rather to forward Day's inventories to the Gutterman defendants. At the direction of the Gutterman defendants, Day provided Accurate Inventory with a list of chemicals that included the nonexistent CLR–Detergent System. Hex. Resp. to Gut. 56.1(A)(3) ¶ 65.

Ruth adds that because the chemicals, packaging and final product were all owned by the Gutterman defendants, they were entitled to inventory them while on Hexagon's premises. Ruth Resp. to Hex. 56.1(b)(3)(B) (Ruth) ¶ 6. In essence, Day overcharged the Gutterman defendants and split the excess between herself, Ruth and Gutterman.

### The Water Billing Scheme

According to Hexagon, Day and the Gutterman defendants also manipulated water usage figures. It is undisputed, however, that Hexagon billed the Gutterman defendants for water usage as part of the manufacturing process, throughout its existence, until 1996. It is undisputed that Day used a computer program to manipulate the water usage figures to reflect the use of the nonexistent CLR Detergent System. It is also undisputed that the water usage figures sometimes reflected more and sometimes less than the actual water used.

Fred Bernstein ("Bernstein") is the current Vice–Chairman and President of Hexagon as well as Edison's son-in-law. In 1995 Bernstein informed the Gutterman defendants that the water figures were incorrect. Both parties agree that at least during the period of time between 1989–1996, the Gutterman defendants refused to pay for water in amounts other than those calculated by Day, and that at least thirty-six water invoices were sent to them via the United States mail. Additionally, Hexagon purchased water deionization equipment in order to manufacture Tarn–X and CLR. However, in 1992, the Gutterman defendants, Day and Ruth began to use tap water instead, without the knowledge of Edison.

### Labor and Storage Costs

In 1994, Gutterman and Day decreased what Hexagon charged the Guttermans for labor and storage for manufacturing Tarn–X and CLR to amounts below those charged by Hosiery Mate a decade earlier. The Gutterman defendants counter that they negotiated new prices that they were willing to pay to have their product manufactured by Hexagon and that they did not have the authority to set the amounts that they were to be charged.

### The Offer To Purchase And To Drive Hexagon Out Of Business

In an attempt to cover up the various schemes, the Gutterman defendants, Ruth and Kevin Haas ("Haas"), a friend of Ruth's, attempted to purchase Hexagon. When Haas met Edison in April 1995, he claimed to represent a secret group of investors. Hex. Resp. to Gut. 56.1(A)(3) ¶ 95. The Gutterman defendants, Ruth, Haas and Day planned to close Hexagon, fire Hexagon's employees, cease doing business with Hexagon's clients, and re-open Hexagon to manufacture only Tarn–X and CLR. Day prepared a "hit list" of employees to be fired. Hex. 56.1(b)(3)(B) (Gut.) ¶ 101. However, Edison refused to sell Hexagon. It is undisputed by Hexagon and the Gutterman defendants that Ruth was fired in September 1995.

Nevertheless, the saga continues. According to Hexagon, when Edison did not sell Hexagon, Day, the Gutterman defendants and Ruth instituted "Plan B." Hex. 56.1(b)(3)(B) (Gut.) ¶ 104. Plan B was an attempt to drive Hexagon out of business so that the defendants could gain complete control over the formulas and continue the CLR Detergent System scheme. At a meeting on April 2, 1996, Gutterman presented Bernstein, who had become Hexagon's new president, and Edison with an "ultimatum:" if Hexagon acknowledged that the Gutterman defendants owned the formulas for Tarn–X and CLR, then Hexagon could bid to perform some of the manufacturing and packaging of the products. Hex. 56.1(b)(3)(B) ¶ 106. Bernstein interpreted this ultimatum as a threat, considering that the Tarn–X and CLR business represented a substantial amount of Hexagon's business. Both sides agree that after April 1996, the Gutterman defendants and Day ceased doing business with Hexagon.

The Gutterman defendants counter that Gutterman did not feel that Bernstein had the experience required to run a packaging plant; therefore, he explored other options for contract packaging services for the Gutterman defendants' products. Gut. 56.1(A)(3) ¶ 114. Gutterman did not threaten Hexagon but rather presented it with a legitimate business proposition.

### Trade Secrets

It is undisputed that the Guttermans employed Harold Zeliger ("Zeliger") to "reverse engineer" the products. Hex. 56.1(b)(3)(B) (Gut.) ¶ 112.

It is undisputed that Hexagon filed the instant suit in July 1996. In September 1996, it is undisputed that the Gutterman defendants and Day entered into a "Memorandum of Independent Consultant Agreement and Assignment" (the "Memorandum"). This document purportedly states that the Gutterman defendants own Tarn–X and CLR; that Day worked as an independent contractor for the Gutterman defendants from 1985 through 1996; that Day "worked on" the products at the Gutterman defendants' direction; and that Day was assigning whatever rights she had in the products to the Gutterman defendants.

The parties dispute whether the formula for Tarn–X is readily ascertainable; however, both parties agree that the Gutterman defendants' advertisements for Tarn–X and CLR focuses on product performance and clearly recognizes the importance of product performance in "building and sustaining a healthy brand." Gut. Resp. to Hex. 56.1(b)(3)(B) (Gut.) ¶ 122.

In sum, both parties agree that from 1985 through 1996, the manufacture of Tarn–X and CLR comprised forty to fifty percent of Hexagon's business. Both parties also agree that the Gutterman defendants received from Day, by mail, invoices for nonexistent chemicals.

The parties' submissions in response to Ruth's motion for summary judgment added the following facts, which are undisputed by Hexagon and Ruth. From 1960 to 1967, Ruth held the position of plant manager for Robert Edison's father, Sylvan Edison, at the Edison Chemical Division of Colgate–Palmolive Company. Edison hired Ruth to serve as President of Hexagon and in this capacity, Ruth hired staff and purchased equipment for Hexagon. Ruth also introduces Ron Katch ("Katch"), who served as Hexagon's accountant. Ruth's motion adds background facts as to how Hexagon functioned. Hexagon served as a chemical contract packager in 1986, blending, manufacturing and packaging household and personal chemical products. According to Hexagon, it was also involved in researching and developing household chemical products. Both parties admit that when Hexagon commenced operations in 1985, it had one customer: Hosiery Mate, Edison's other company.

Hexagon received the raw chemicals for Tarn–X and CLR. Hosiery Mate owned and ordered the raw materials, which Hexagon blended, packaged and shipped to Hosiery Mate. Hexagon also invoiced Hosiery Mate for these services, but it never charged for the raw materials, because it never owned them. Ruth refers to the Gutterman companies as one of Hexagon's customers. Hexagon disputes this characterization, referring to the Gutterman "entity" as Hosiery Mate's distributor.

Between 1986 and 1989, Hexagon incurred operating losses. Hexagon attributes the losses to the fact that Hosiery Mate was "forced" to sell Tarn–X to the Gutterman Companies at or below cost as a result of Gutterman's "representations" regarding reinvesting the profits of Tarn–X and CLR. Hex. Resp. to Ruth 56.1(A)(3) ¶ 4, Hex. 56.1(b)(3)(B) (Gut.) ¶ 3. Ruth attributes the losses to Edison, who dictated what Hexagon charged Hosiery Mate so that Hosiery Mate would show a profit.

It is undisputed that in 1993, Hexagon turned a profit for the first time, and the profit increased the next year. Hexagon avers that Ruth instituted a scheme to force Hexagon to pay unnecessary ware-

housing costs. According to Hexagon, Ruth allowed Gutterman to dictate his preferred prices to Hexagon. As part of the plan to drive Hexagon out of business, Ruth provided Day and Gutterman with a list of all of the equipment and materials needed for the production of CLR and Tarn–X, including details of part numbers, source and pricing. Hex. Resp. to Ruth 56.1(b)(3)(B) ¶ 14, App. C. Montejo Dep. 131–132.

Hexagon makes the following accusations against Ruth. Hexagon claims that Ruth mailed false invoices to the Gutterman defendants for water usage; signed and mailed at least one Hexagon check in order to purchase equipment for Day's personal use with Hexagon's corporate funds; and purchased unnecessary warehouse space with Hexagon funds. Ruth admits to sending chemical inventories to Day; however, he claims no knowledge as to Day's manipulation of the inventory and her inclusion of nonexistent chemicals.

### DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable and justifiable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"The standard governing summary judgment is clear: '[I]f no rational jury could, on the evidence presented in the summary judgment proceeding, bring in a verdict for the party opposing summary judgment ... then summary judgment must be granted.'" Oates v. Discovery Zone, 116 F.3d 1161, 1175 (7th Cir.1997) (citing Visser v. Packer Engineering Associates, Inc., 924 F.2d 655, 660 (7th Cir.1991)). The plaintiff has to produce more than a scintilla of evidence in support of its position. See Anderson, 477 U.S. at 252, 106 S.Ct. 2505.

■ A party may not amend its Complaint through its Response to a motion for summary judgment. See Speer v. Rand McNally & Co., 123 F.3d 658, 665 (7th Cir.1997). Additionally, arguments raised in a motion for summary judgment that are not addressed by the nonmoving party are waived. See Laborer's Int'l. Union v. Caruso, 197 F.3d 1195, 1197 (7th Cir.1999).

■ Since diversity of citizenship does not exist, jurisdiction of this court is dependant on the causes of action based on RICO. In Counts I and III, Hexagon alleges that the defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). A civil action under RICO may be brought by "[a]ny person injured in his business or property by reason of a violation of § 1962 of this chapter." 18 U.S.C. § 1964(c). The elements of a § 1962(c) RICO violation are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. See Mira v. Nuclear Measurements Corp., 107 F.3d 466, 473 (7th Cir.1997). The "conduct" must be more than mere participation; rather, the defendant must be involved in the operation and management of the enterprise. See Goren v. New Vision Int'l., Inc., 156 F.3d 721, 727 (7th Cir.1998).

In Counts II and IV, Hexagon alleges violations of 18 U.S.C. § 1962(d), under which it is unlawful to conspire to violate RICO. See Beck v. Prupis, 529 U.S. 494, 120 S.Ct. 1608, 1611, 146 L.Ed.2d 561 (2000). Count V alleges that Day and the Gutterman defendants violated the Illinois Trade Secrets Act. 765 ILCS 1065, et seq. Counts VI and VII allege common law fraud and civil conspiracy. Finally, in

Count VIII, Hexagon alleges that Day and Ruth breached their fiduciary duty.

The court addresses Hexagon's RICO claims. On June 9, 1997, this court partially denied the defendants' motions to dismiss. In part, this court ruled that Hexagon had stated a claim upon which relief could be granted because Hexagon alleged that (1) "the Gutterman defendants and Joseph Ruth persuaded Edison to hire a chemist named Betty Day"; (2) "[t]he Gutterman Defendants have since been marketing and selling products based on these formulae as their own, depriving Hexagon of its rightful profits"; (3) "[p]laintiffs contend that, since this April 1996 meeting, Day and the Gutterman Defendants have been wrongfully using Hexagon's confidential formulae and packaging instructions for the CLR, Tarn–X, an Silver Glaze products . . ."; and (4) "[p]laintiff's complaint alleges that the Gutterman Defendants—associated with Hexagon as its marketers—were able to place Ms. Day in Hexagon's employ." *Hexagon Packaging Corp. v. Manny Gutterman & Associates, Inc.*, No. 96 C. 4356, 1997 WL 323501, *1, 2, 12 (N.D. Ill. June 9, 1997).

In its Responsive Brief, Hexagon significantly changes its allegations and, consequently, its theory of the case. Hexagon admits that (1) the Gutterman defendants are not manufacturing products using "Hexagon's" formulas; (2) assuming the formulas are Hexagons, Edison actually gave the Gutterman defendants the CLR and Tarn–X formulas to export them; (3) it was Edison who introduced Day to the Gutterman defendants; and (4) it was Edison who made Day responsible for quality control when he hired her, before she had met the Guttermans.

As a result of the changes in its theory of the case and intervening changes in the law, the Gutterman defendants challenge that Hexagon has not sustained an injury from any alleged predicate act.

■ In order to recover under RICO, Hexagon must show that it was injured by the defendants' conduct. *See Sedima, S.P.R.L. v. Imrex Co., Inc.* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)."), *see also Beck*, 120 S.Ct. at 1611.

In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 266–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Supreme Court held that a plaintiff must establish that the defendant, by violating RICO, proximately caused the plaintiff's injuries: there must be "some relation between the injury asserted and the injurious conduct alleged." *See also Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 958 (7th Cir.1996).

In *Beck*, the Supreme Court abrogated *Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344 (7th Cir.1992). This court relied on *Schiffels* to find that "no predicate acts even need to be committed to sustain a RICO conspiracy claim." *Hexagon* at *14.

■ In *Beck*, the Supreme Court held that "a person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act that is not an act of racketeering or otherwise unlawful under the statute." 120 S.Ct. at 1616. In *Beck*, the Court dismissed the RICO conspiracy claim because the plaintiff's injuries arose from the termination of his employment—not from an actionable racketeering activity. *Id.* Hexagon must show that the alleged overt acts were acts of racketeering, and the injuries suffered by Hexagon were caused by racketeering.

Despite its lengthy Complaint, in Response to the Gutterman defendants' motion for summary judgment, Hexagon cites three ways that it has been injured and suffered damages. Hex. Resp. at 38–39. First, Hexagon alleges that it has lost the value of its trade secret formulas. *Id.*

Second, Hexagon alleges the loss of half of its business as a result of the Gutterman defendants ceasing to do business with it. *Id.* Finally, Hexagon alleges, for the first time, that the Gutterman defendants failed to pay a royalty to Hexagon. *See Malec v. Sanford,* 191 F.R.D. 581, 589 (N.D.Ill.2000) (Claim deemed waived when plaintiff failed to present argument as to claim in response to motion for summary judgment).

The court addresses these arguments in turn, as they directly determine whether Hexagon can recover under any of the RICO Counts in its Second Amended Complaint. In Response to Ruth's argument about Hexagon's lack of a racketeering injury, Hexagon does not submit additional injury theories; it relies solely on its royalty theory of damages: "Hexagon has suffered damages because Ruth, while running Hexagon as a RICO enterprise in association with other defendants, failed to charge the Gutterman Defendants a reasonable royalty for their use of the CLR and Tarn–X formulas." Hex. Resp. (Ruth) at 7.

In its Response, Hexagon's new trade secret misappropriation theory is that between 1989 and 1996, the Guttermans used the formulas and did not pay Hexagon a royalty. *See* Royalty discussion, *supra.,* Hex. Resp. at 32, Hex. Resp. to Gut. 56.1(A)(3) ¶ 115. Hexagon admits that before 1996, the Gutterman defendants only advertised, marketed and sold CLR and Tarn–X; whereas, Hexagon was responsible for mixing and bottling the products. Gut. 56.1(A)(3) ¶¶ 22, 25.

■ Hexagon claims that it has suffered loss in the value of its trade secret formulas. Hexagon argues that it owns the beneficial interest in the formulas and that the formulas constitute trade secrets. To establish trade secret misappropriation, in other words, to establish that it even has a proprietary right which has suffered a loss, Hexagon must establish that the formulas are "(I) secret (that is, not generally known in the industry), (ii) misappropriated (that is, stolen from it rather than

developed independently or obtained from the owner or a third source), and (iii) used in the defendants' business." *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1265–66 (7th Cir. 1992).

■ The defendants do not have to copy or use each and every element of a trade secret; the defendants may be liable for misappropriation, even if the defendants created a new product, if they could not have done so without use of the trade secret. *See Mangren Research and Dev. Corp. v. National Chemical Co., Inc.,* 87 F.3d 937, 944 (7th Cir.1996).

As a result in a change in its material allegations, Hexagon now admits that the Gutterman defendants did not use its formulas after 1996, nor is it seeking damages in connection with the Gutterman defendants' use of the post–1996 formulas. *Id.* ¶ 115. Edison admits that he gave the formulas to the Gutterman defendants. Hex. 56.1(b)(3)(B) (Gut.) ¶ 18. Edison also admits that if he manufactured the products today, they would sell better than the designated products, which undercuts Hexagon's argument that the value of the alleged trade secrets has suffered. Gut. Reply, App. 4 Edison Dep., 12/9/98 at 63.

Hexagon argues that the products, which the two companies were generating and profiting from together, caused Hexagon a trade secret loss. *See* Hex. Resp. at 37. The Guttermans were not distributing separate products from those manufactured and packaged by Hexagon. Hexagon does not cite any law in support of its contention; however, the theory seems to correspond to its argument that between 1989 and 1996, the defendants were using Hexagon as a RICO enterprise against Hexagon.

■ Hexagon has not established that it lost value in "its" trade secrets as a result of a RICO violation; Hexagon's misappropriation claim fails as a matter of law to establish a RICO injury to Hexagon

caused by the defendants' allegedly wrongful conduct because it has been abandoned. This court denied the defendants' motion to dismiss, in part, because "the allegations support a finding that the underlying misappropriation scheme, furthered by these mailings, proximately caused plaintiff's injury." *Hexagon* at *8. The "allegations" that the court relied on were that after 1996, the Gutterman defendants sold "products made with plaintiffs' formula without interference from plaintiffs." *Id.* at *10. Hexagon has abandoned the misappropriation scheme relied on by this court. Hexagon's new theory no longer evidences proximate causation of its injury.

Hexagon's President, Bernstein, testified that he pursued litigation to "get what the formulas that we had developed back." Gut. Reply, App. 5 at 213. Apparently, Hexagon now continues to pursue this litigation based on events between 1989–1996 when Hexagon and the Guttermans were still working together. However, Hexagon inextricably links the 1989–1996 injury to its royalty claim, which is fatally flawed. *See supra.,* Hex. Resp. at 32, 38. After the presentation of Hexagon's case, the changes thereto and lack thereof, the misappropriation scheme and the claims of loss in value to the trade secrets fail to satisfy its RICO Counts.

Next, Hexagon claims that it "lost half its business" when the Gutterman defendants discontinued the parties' business relationship. Hex. Resp. at 38. There is no breach of contract count before this court. Rather Hexagon has alleged four RICO violations. According to the Seventh Circuit, "[b]reach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud. It is correspondingly difficult to recast a dispute about broken promises into a claim of racketeering under RICO." *Perlman v. Zell,* 185 F.3d 850, 853 (7th Cir.1999).

For instance, to highlight the gravity of a RICO charge, RICO counts are to be pled with particularity in part because of the seriousness of a fraud allegation and in order to prevent the *in terrorem* settlement effect of RICO's treble damages provision. *See R.E. Davis Chemical Corp. v. Nalco Chemical Co.,* 757 F.Supp. 1499, 1516 (N.D.Ill.1990). There is no triable issue as to why Hexagon was entitled to force the Gutterman defendants to continue to do business with it.

Hexagon's loss of business also lacks a causal connection to the defendants' alleged racketeering conduct. In *Holmes,* the Securities Investor Protection Corporation ("SIPC"), representing nonpurchasing customers, attempted to sue the defendants, who allegedly manipulated stocks. *Holmes* 503 U.S. at 261, 112 S.Ct. 1311. The defendants harmed brokers, who, in turn could not pay the nonpurchasing customers. *Id.* at 261, 112 S.Ct. 1311. The Court held that there was no proximate cause between the injury and the injurious conduct: "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Id.* at 269, 112 S.Ct. 1311.

In this case, the defendants' conduct similarly lacks a causal connection to Hexagon's injury. First, in allowing the RICO claims to survive, this court relied on Hexagon's allegation that "[t]he Gutterman defendants have since been marketing and selling products based on these formulae as their own, depriving Hexagon if its rightful profits." *Hexagon* at *1. In that Hexagon admits that the defendants are not using "its" formulas, such claims can no longer serve as the antecedent to its alleged injury. Furthermore, Hexagon now argues that its misappropriation injury derived from the Guttermans' use before 1996. *See* Hex. Resp. at 32, Hex. Resp. to Gut. 56.1(A)(3), *Laborer's Int'l. Union,* 197 F.3d at 1197.

Second, Hexagon alleges that the Gutterman defendants somehow forced Edison to give Day billing, inventory, purchasing, and pricing power so that Day could bill the Gutterman defendants for nonexistent

chemicals and then Day, Ruth and Gutterman could split the payment. The missing link is that there is no connection between this alleged scheme and any loss Hexagon received when the Gutterman defendants ceased to do business with it.

In fact, it is hard to even argue that the alleged RICO conduct was the "but for" cause of the injuries arising from the Gutterman defendants ceasing to do business with Hexagon. *Holmes* at 265, 112 S.Ct. 1311. At worst, Day was overcharging *the Gutterman defendants* and then Day paid out the extra to Gutterman and Ruth, which harmed, at most, the federal government and Gutterman's own partners and perhaps, brothers.

Even though this court found that Hexagon's § 1962(c) allegations were "tenuous," Hexagon stated a claim by alleging that "the Gutterman Defendants—associated with Hexagon as its marketers—were able to place Ms. Day in Hexagon's employ." *Hexagon* at *12. The allegation can no longer support this case and can no longer connect Hexagon's alleged schemes to its loss in business nor, as mentioned, impact Hexagon's alleged "trade secrets."

Finally, in its Brief in Opposition to the Gutterman defendants' motion for summary judgment, Hexagon introduces allegations that the Gutterman defendants agreed to but never paid royalties to Hosiery Mate for the use of the Tarn–X and CLR formulas. Edison raises the royalty issue in an affidavit signed on May 4, 2000, alleging that he charged the Gutterman defendants a royalty from 1970 through 1989, and in 1989, he instructed Ruth and Day to renegotiate a royalty rate with the Gutterman defendants. Edison avers that he did not learn that royalties were not being paid until late 1995. Hex. 56.1(b)(3)(B)(Gut). App. 22, ¶ 7.

As mentioned above, "[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996). Hexagon has filed three complaints in this case. It instituted this case in 1996; hundreds of thousands of pages of documents and testimony have been produced. There is no mention of the royalty payments in Hexagon's Second Amended Complaint, filed in September 1998. It seems that Hexagon changed its theory of the case late in the game and "[s]uch eleventh hour amendments should ordinarily be presented to the district court, which has discretion to grant or deny the motion." *Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 664 (7th Cir.1998).

Unlike a situation where a plaintiff needs discovery in order to develop its legal theory of the case because the documents and pertinent information are in the control of the defendant, in this case, Edison was central to the alleged royalty discussion from the beginning. *Cf. Partners, L.P. v. Sensormatic Electronics Corp.*, No. 96 C 4072, 1997 WL 570771, *17 (N.D.Ill. Sept.10, 1997) ("If the allegations of fraud depend upon facts particularly within the exclusive control of the defendant, then a plaintiff should still plead those facts within its knowledge or belief that demonstrate that its charges are not baseless, and what type of additional information is in the defendants' exclusive control.").

In *Colovos v. Owens–Corning Fiberglas Corp.*, No. 93 C 6483, 1995 WL 609115, *9 (N.D.Ill. Oct.13, 1995), this court held that "[a] court should strengthen its unwillingness to consider 'new' theories leveled in response to a defendant's summary judgment motion when, as in the instant case, the plaintiff accuses the defendant of committing fraud." *Citing Samuels v. Wilder*, 871 F.2d 1346, 1349–51 (7th Cir.1989). Even after Ruth was fired and Edison's son-in-law assumed the Hexagon reins, the invoices do not reflect royalty charges. Gutterman Reply Ex.App. 3. Accordingly, the alleged royalty agreement between the Gutterman defendants and Hexagon is not a viable theory for Hexagon nor can it support the Hexagon trade secret claim.

In sum, Hexagon's four RICO Counts fail as a matter of law against all of the defendants. Hexagon cannot show that the defendants conspired to or conducted an enterprise through a pattern of racketeering activity which proximately caused injury to Hexagon. 18 U.S.C. § 1962(c), (d), *see also Sedima,* 473 U.S. at 496, 105 S.Ct. 3275, *Holmes,* 503 U.S. at 266–67, 112 S.Ct. 1311, *Beck,* 120 S.Ct. at 1611.

Nevertheless, state law claims remain against Day and the Gutterman defendants for violating the Illinois Trade Secrets Act, against Ruth and Day for breach of fiduciary duty and against all of the defendants for common law fraud and civil conspiracy.

The court notes, for example, that Hexagon alleged that the Gutterman defendants, Ruth and Day manipulated labor and storage fees, which Hexagon did not cite as an injury in its responses to the instant motions and which alone cannot support Hexagon's RICO allegations. *See, e.g.,* Compl. ¶¶ 61, 62, 63.

For example, in order to satisfy the first factor of § 1962(c), to conduct a RICO enterprise, a liable defendant must to do more than merely participate in the endeavor, the defendant must exercise some measure of control over the enterprise. *Reves v. Ernst & Young,* 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). There is no evidence that the Gutterman defendants operated and managed the leasing of unnecessary storage space or the purchasing of equipment for Day's personal use. *See id.* Additionally, the Guttermans reimbursed Hexagon for the warehouse space, again raising issues of Hexagon's injury or whether this allegation caused Hexagon injury. See, Ruth Resp. to Hex 56.1(b)(3)(B) ¶ 4.

As to Ruth, without Hexagon's litany of additional allegations there is a lack of a material issue that the space was unnecessary. Hexagon cites to the testimony of its controller, Dawn Schneider, who testifies that the expenditures "seemed" unnecessary. *See* Hex. 56.1(b)(3)(B) App. E, *see*

*also Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). As to the equipment-for-Day's-personal-use allegations, although Hexagon submits copies of checks for equipment, there is no proof that the equipment went to Day, let alone for her personal use.

Hexagon admits that the sufficiency of its RICO claims depend upon the interrelatedness all of its allegations: "[d]espite the Gutterman Defendants' attempt to break apart the overarching schemes into smaller pieces in order to minimize the impact on Hexagon, the evidence supports Hexagon's allegations that the Gutterman Defendants, Day, and Ruth entered into an association-in-fact, took control over every aspect of Hexagon's operations, and used the company as a tool to defraud both Hexagon and others." Hex. Resp. at 16.

In that the court dismisses the federal claims, this court declines to extend supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(a), *see also Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 727 (7th Cir.1998) ("Having determined that summary judgment was appropriate on plaintiff's federal claims against defendants, the district court declined to exercise supplemental jurisdiction over plaintiff's state law claims of defamation and tortious interference with employment relationship.").

A district court "may decline to exercise supplemental jurisdiction" over state law claims if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). In *Wright v. Associated Insurance Cos., Inc.,* 29 F.3d 1244, 1251 (7th Cir.1994), the Seventh Circuit stated that "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits."

"Pendent jurisdiction is a power which the district court, in the exercise of its sound discretion, may choose to grant; it is not a plaintiff's right." *Landstrom v. Illinois Dept. of Children and Family Services,* 892 F.2d 670, 679 (7th Cir.1990).

### CONCLUSION

For the foregoing reasons, the Gutterman defendants' Motion for Summary Judgment is granted in part and denied in part. Ruth's Motion for Summary Judgment is granted in part and denied in part. The RICO causes of action, Counts I–IV are dismissed. The case is remanded to state court.

Hexagon's Motion for Sanctions filed January 10, 2000, and Motion to Reset the Trial Date filed February 10, 2000 are dismissed as moot.

**IT IS SO ORDERED.**